Tony D. COWART, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 77–2855.

United States Court of Appeals, Fifth Circuit.

May 15, 1980.

---

Beverly B. Bates, Atlanta, Ga., for plaintiff-appellant.

William E. Turnipseed, Douglas P. Roberto, Asst. U. S. Attys., Atlanta, Ga., for defendant-appellee.

Before GEE, TJOFLAT and ANDERSON, Circuit Judges.

GEE, Circuit Judge:

In this case, we are again presented with the difficult task of determining whether the government is liable to a federal prisoner under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1976), for injuries resulting from an assault upon him by another inmate. Although this is a close case, one in which we might reach a different result if we were sitting as a trial court, we nevertheless affirm the district court's judgment for the government.

Plaintiff Tony Cowart, convicted of distributing a controlled substance, was incarcerated at the Federal Correctional Institution (FCI), a medium-security, youthful-offender institution[1] in Tallahassee, Florida. At 6:30 a. m. on October 19, 1974, Cowart was stabbed in the heart while he slept, presumably with a knife from the FCI dining hall.[2] His alleged assailant was Ronald McHarris, Jr., another inmate.[3] As a result of this attack, Cowart suffered brain damage, cortical blindness, and other injuries that rendered him substantially and permanently incapacitated.

The attack occurred in the north wing of C–Dormitory, which housed approximately 160 inmates in two wings of 80 prisoners each. Each wing was divided into cubicles by low walls approximately three to four feet high. These walls partially obscured the view into the cubicles, which could be entered at will by other inmates. As was customary during the night shift (midnight to 8:00 a. m.), there was only one officer on

---

1. Prisoners incarcerated in FCI are between the ages of 18 and 24.

2. The weapon with which Cowart was stabbed was never found.

3. McHarris was never indicted for the crime, but he was found to have committed it by a prison disciplinary committee.

duty in C–Dormitory at the time when the assault occurred. His desk was located in the lobby area between the two wings of the dormitory, not in the center of the lobby but against the wall. From his desk, the officer's view into C–North was apparently obstructed by a small office used by correctional counsellors. At the time of the incident, the correctional officer was seated at his desk, conversing with an inmate and making several telephone calls.[4] Although he did not see or hear the assault, the correctional officer went immediately to Cowart's aid when notified of the assault. The officer on duty had worked in other FCI buildings but had never previously been assigned to C–Dormitory nor had he received any information concerning McHarris before the assault.

The assailant, McHarris, was serving a twelve-year sentence for kidnapping. He had a lengthy criminal history, including incidents of larceny, burglary, possession of narcotics, assault, and disorderly conduct.[5] Although apparently no psychological evaluation of McHarris was made at the time he was incarcerated on his kidnapping offense, his presentence report contained a summary of a psychiatric evaluation conducted in 1969 at an Alto, Georgia, reformatory, where McHarris was then incarcerated. The psychiatrist diagnosed McHarris as a latent schizophrenic who was quite seriously disturbed and "likely [to] continue

delinquent behavior unless there was psychiatric or psychological intervention."[6]

McHarris had been transferred to FCI after he was involved in an early-morning dorm fight[7] at the El Reno, Oklahoma, federal reformatory, which housed youthful offenders. On his transfer to FCI, McHarris was classified as a "close-custody"[8] inmate, a status held by approximately ten percent of the inmates at FCI.

Eighteen months elapsed between McHarris' transfer and the assault on Tony Cowart. During that time McHarris was the subject of two incident reports, which were included in his file, and he was mentioned in a third, which was not so included. The first incident report on McHarris concerned a fight between McHarris and another prisoner in the A–North dormitory at 9:45 a. m. on June 21, 1974. The investigator who prepared the report concluded that "McHarris was apparently trying Ellison for sex, but Ellison did [not] want [any] part of it." He further commented that "McHarris has been complained about by several inmates that he walks around [his] dorm . . . and 'pats' weak inmates on the rear end after the lights go out."[9] McHarris' second incident report concerned his possession of contraband (a $10 bill) on July 6, 1974. In addition to these two reports, McHarris figured in an incident report filed on Raleigh T. Taylor for assaulting another prisoner at noon on April 4, 1974. Although Taylor alone perpetrated

---

4. The calls were intended to clarify the work assignment of the prisoner to whom the correctional officer was speaking.

5. McHarris' presentence report indicated that he was also a suspect in several armed robberies at the time he was convicted on his kidnapping offense. However, the record does not indicate whether or not he was ever indicted for or convicted of those offenses.

6. The presentence report also incorporated an abstract of a 1970 report prepared by McHarris' counsellor at the Columbus (Georgia) Vocational Rehabilitation Office. Among other observations, the counsellor opined that McHarris "should be institutionalized because of mental reasons."

7. The incident report from El Reno indicates that "about 2:20 a. m. inmate McHarris was fighting with 20499 Hutchins in the area be-

tween their bunks. Hutchins had a combination lock in a sock and McHarris was trying to take it from him. Both inmates quit fighting when asked to." The investigator commented that "[i]t appears McHarris was either actually attempting to pressure Hutchins or was picking at him just to agitate and see Hutchins' display of anger."

8. The significance of this term is disputed. See nn. 16–18 and accompanying text, infra.

9. One who engages in this type of behavior is known as a "night roamer." Correctional Counsellor Richard Routt testified that he had knowledge "probably ten months" before the assault of rumors among the inmates that McHarris was a night roamer.

the assault, the correctional counsellor who filed the report noted that "Taylor & 37770–115 McHarris approached him [the victim] & stated they wanted sex." Finally, a notation dated January 23, 1974, in McHarris' health record indicated that "McHarris has been tentatively identified as the resident who has been pressuring white inmates in the dorm."

A treatment team [10] reviewed McHarris' record on July 10, 1974. It noted McHarris' "unusual sexual advances to other inmates" and expressed concern for "his and others' protection." The treatment team recommended that McHarris see Marguarite Gilbert, a psychology trainee/psychological intern [11] who had been at FCI for only five days. After interviewing McHarris, Ms. Gilbert characterized him as "bored" [12] and recommended "beefing up" his program to provide him with more intellectual stimulation. Apparently because she felt that McHarris did not pose an imminent danger,[13] Ms. Gilbert did not recommend that McHarris see a psychiatrist, that he be transferred to another dormitory or institution, or that he receive any other form of treatment. The assault on Cowart occurred approximately three months after McHarris' interview with Ms. Gilbert.

At trial Cowart raised numerous allegations of negligence on the part of the government or its agents and contended that these acts caused his injuries: (1) failure to give more supervision to McHarris, a close-custody inmate, than to inmates in minimum and medium custody; (2) inadequate psychiatric evaluation and treatment of McHarris in view of his prior history; (3) inadequate supervision on the night of the assault; (4) the transfer of McHarris to FCI; (5) the assignment of McHarris to a

cubicled dormitory; (6) improper construction of C–Dormitory; (7) overcrowding of FCI; and (8) failure to prevent the filching of knives from the dining hall. Testimony focused on the first three allegations.

The district court did not make specific findings with respect to each theory of negligence alleged by Cowart. Instead, the court found that McHarris, although known as a night roamer and homosexual, "had caused no serious problems" and had a character "no worse than the general run of prison inmates." Accordingly, it found that McHarris' criminal conduct was an independent, intervening cause of Cowart's injuries not foreseeable in the exercise of ordinary care. Thus, it concluded that Cowart's injuries were not proximately caused by the government's negligence. Because we are unable to overturn the court's findings that the conduct of the government was not negligent in any respect, we affirm its judgment for the government without reaching the issue of proximate cause.

Under the FTCA, the government's liability to a claimant is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (1976). Thus, in the instant case, Florida law applies. There are four elements necessary to establish a cause of action in Florida based on negligence: (1) a duty requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risk; (2) a failure on his part to conform to that standard; (3) a reasonable causal connection between the conduct and the resulting injury; and (4) actual loss or damage. *Simon v. Tampa Electric Co.*, 202 So.2d 209,

---

**10.** A treatment team is composed of a caseworker, a correctional counsellor, an educational advisor, and a representative of the mental health department.

**11.** At the time Ms. Gilbert began her internship at FCI, she had completed all the requirements for her Ph.D. in psychology at the University of Florida except her dissertation.

**12.** In her deposition, which was admitted at trial, Ms. Gilbert testified that she recalled

McHarris as being "disaffiliated" and "rather estranged."

**13.** In her deposition Ms. Gilbert stated that she did not recall whether, at the time she interviewed McHarris, she had believed that McHarris posed an imminent danger. She noted, however, that she would have been likely to record a belief that McHarris was an imminent danger but that the records reflected no such notation to that effect.

213 (Fla.App.1967), *citing* Prosser, *Law of Torts* 146 (3d ed. 1964). *See also Angell v. F. Avanzini Lumber Co.*, 363 So.2d 571, 572 (Fla..App.1978).

■ In *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), the Supreme Court held that "the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042,[14] independent of an inconsistent state rule." *Id.* at 164–65, 83 S.Ct. at 1859 (footnote omitted).[15] This duty requires "the exercise of ordinary diligence to keep prisoners safe and free from harm." *Jones v. United States*, 534 F.2d 53, 54 (5th Cir.), *cert. denied*, 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 586 (1976). Some antisocial behavior is to be expected in a prison environment; accordingly, the government is not an insurer of the safety of a prisoner. *Id.; Fleishour v. United States*, 244 F.Supp. 762, 766 (N.D. Ill.1965), *aff'd*, 365 F.2d 126 (7th Cir.), *cert. denied*, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966). The government's liability ultimately depends upon whether the risks it took were reasonable or unreasonable.

Although the concept of foreseeability is ordinarily associated with the issue of proximate cause, it is also bound up with the nature of the duty that an actor owes to others. As noted above, an actor has a duty to protect others against *"unreasonable risk."* *Simon*, 202 So.2d at 213 (emphasis added). As Prosser notes:

The idea of risk necessarily involves a recognizable danger, based upon some *knowledge of the existing facts* and some reasonable belief that harm may follow. A risk is a danger which is *apparent or should be apparent* to one in the position of the actor. The culpability of the actor's conduct must be judged in light of the *possibilities apparent to him at the time*, and not by looking backward "with the wisdom born of the event." The standard must be one of conduct, rather than of consequences.

Prosser, *Law of Torts* 146 (4th ed. 1971) (footnotes omitted) (emphasis added).

Using Prosser's formulation, we must thus determine whether McHarris' assault on Cowart was a danger that was apparent or should have been apparent to prison officials on the basis of the information then available to them.

The crux of Cowart's suit was that the government had a duty to supervise McHarris more closely than other inmates or segregate him from the prison population because they knew or should have known that he presented an unreasonable risk to other inmates, far greater than the risk posed by a "typical" prisoner at FCI. To buttress this contention, Cowart pointed particularly to McHarris' criminal history, his series of incident reports at El Reno and FCI, prison officials' awareness of McHarris' homosexual activity and night roaming, the psychiatric evaluation in McHarris' presentence report, and McHarris' status as a close-custody inmate.[16] In addition, Cowart

---

**14.** 18 U.S.C. § 4042 provides in pertinent part:
The Bureau of Prisons, under the direction of the Attorney General, shall—
    (1) have charge of the management and regulation of all Federal penal and correctional institutions;
    (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;
    (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States . . . .

**15.** Although *Muniz* left open the application of the "discretionary function" exception to FTCA liability (28 U.S.C. § 2680(a)), 374 U.S. at 163,

83 S.Ct. at 1858, subsequent cases have established that the actions of prison officials are at the "operational level" and are thus actionable under the FTCA. *Cohen v. United States*, 252 F.Supp. 679, 687 (N.D.Ga.1966), *rev'd on other grounds*, 389 F.2d 689 (5th Cir. 1967); *Fleishour v. United States*, 244 F.Supp. 762, 766 (N.D.Ill.1965), *aff'd*, 365 F.2d 126 (7th Cir.), *cert. denied*, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966).

**16.** Cowart contends that close-custody classification is intended not only to reduce the escape hazards of a particular inmate but also to provide close supervision for unusually difficult prisoners. This view of close-custody status was supported at trial by the testimony of Dr. Vernon Fox, a professor in the School of Crimi-

stressed that while most of the inmates at FCI were youth offenders serving sentences of from two to five years, McHarris had received a twelve-year adult sentence. Finally, Cowart presented testimony of a psychiatrist that, on the basis of the information available to prison officials, the government's handling of McHarris, whom he characterized as a "very difficult person," was "very inadequate."

The district court nevertheless found that McHarris had caused no serious problems and had no worse a character than that of other inmates. In reviewing these findings of fact, we are bound by a clearly erroneous standard. Fed.R.Civ.P. 52(a). Because we are not left "with the definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), we conclude that the findings are not clearly erroneous. The government presented a number of witnesses who testified that McHarris was no worse a threat to the safety of other inmates than many of the prisoners at FCI. Gerald Farcas, Warden at FCI, testified that on the basis of McHarris' records, he did not see McHarris "as a threat to the institution population in comparison with other cases that we get." Correctional Counsellor Richard Routt testified that McHarris was not a violent or problem in-

mate, that he was not an assaultive individual, and that his prior criminal history, as recorded in his presentence report, "would be no different than 50% or more of the people we get." Testimony offered by Hubert Ricks, former chief correctional supervisor at FCI, indicated that in his experience three incident reports during a period of 18 months were not unusual, particularly where, as here, the incidents were "not that serious." Ricks' view was corroborated by George Wilson, a correctional treatment specialist at FCI, who testified that incidents of the sort in which McHarris was involved were "normal, everyday happenings within a correctional institution, usually a spur-of-the-moment-type thing where inmates release tension." [17] While recognizing that all of the individuals who testified for the government on this issue were affiliated in some way with FCI, we defer to the credibility choices made by the district court. In light of this and other testimony,[18] we cannot say that the factual findings of the district court were clearly erroneous. Thus, we conclude that because McHarris was "no worse than the general run of prison inmates," the government had no duty to accord him more supervision than other prisoners or segregate him from the prison population.[19]

Cowart seeks to bring the facts of this case within the ambit of *Cohen v. United*

nology at Florida State University, who agreed with the following definition of close-custody status, taken from the American Correctional Association's Manual of Correctional Standards at 368 (3d ed. 1966):

In practice, *Close Custody* inmates are housed in the institution's most secure housing units, are assigned to work within the institution enclosure, and are under constant supervision. *Close* custody classification is intended not only to reduce the escape hazards but to provide close supervision for sex deviates, abnormal, or unusually difficult types of prisoners.

(emphasis in original).

17. Wilson further testified that "[t]here is also a lot of pressuring-type things, pressure for commissary, pressuring for sex and this type of thing happening in an institution. [From w]hat I see here on these reports . . . I would not probably be overly concerned that this man was a very aggressive, hostile inmate."

18. With respect to the significance of "close-custody" status, see n. 16, *supra*, the government presented testimony from several witnesses, including a correctional consultant, that the term refers only to escape potential, not to the degree of supervision to be afforded a prisoner within the institution as Cowart contended.

Regarding the treatment team's concern for McHarris' "and others' protection," two of the four members of the team testified that they were concerned only for McHarris' safety and not the safety of others, despite the notation to the contrary.

19. For the same reasons, Cowart's claims that the government was negligent in transferring McHarris to FCI and in placing him in a dormitory setting must fail.

*States*, 252 F.Supp. 679 (N.D.Ga.1966), *rev'd on other grounds*, 389 F.2d 689 (5th Cir. 1967). In *Cohen* the assailant, McDonald, had a lengthy history of psychiatric treatment predating his incarceration. After several incidents in prison, one involving a knife attack on another inmate, McDonald received a complete psychiatric evaluation. At that time he was specifically classified as paranoid with "considerable likelihood of his having recurrent psychotic episodes in the future under situations of stress." *Id.* at 683. Later, after using strong-arm tactics on another inmate, he was placed in administrative segregation. Nevertheless, he was permitted to go to an exercise yard, from which he escaped and assaulted Cohen. The district court concluded that the government was negligent in granting an assaultive individual with "a psychiatric record *such as the one revealed here*," *id.* at 698 (emphasis added), the freedoms available to other prisoners and allowed Cohen to recover for his injuries.

To bring the instant facts within *Cohen*, Cowart points to the psychiatric evaluation in McHarris' presentence report that characterized him as a latent schizophrenic who was "likely [to] continue delinquent behavior" unless he received psychiatric help. *See* n. 6 and accompanying text, *supra*. In addition, he relies on the government's knowledge of rumors cited in McHarris' health report and the various incident reports, that McHarris was a homosexual and a night roamer. Finally, he emphasizes the treatment team's concern for the safety of McHarris and others in light of his sexual advances to other prisoners.

After closely examining the record in this case, we do not feel it is controlled by *Cohen*. McHarris had never been diagnosed as psychotic or actively insane, as had the assailant in *Cohen*, 252 F.Supp. at 683. Although the psychological evaluation included in his presentence report noted that McHarris was likely to continue "*delinquent* behavior" (emphasis added) without psychiatric intervention, the term "delinquent" implies undesirable, perhaps criminal, but not necessarily assaultive or life-threatening behavior.[20] In contrast, the assailant in *Cohen* was diagnosed as likely to have "recurrent *psychotic* episodes in the future." *Id.* at 683 (emphasis added). Moreover, the assailant in *Cohen* had been detained in administrative segregation at the time the assault occurred. The court in *Cohen* stressed that not all prisoners with assaultive records must be locked in a cell, *id.* at 689; however, it concluded that having made the decision to place the assailant in maximum segregation, "the government was bound to take the necessary steps to enforce that decision." *Id.* The court made the narrowness of its holding clear.

> Had a fellow prisoner *not in segregation and within the normal emotional range of prisoners* committed the assault on Cohen in the dining hall or the Radio-TV shop or elsewhere, there would be *no hesitancy in finding for the government. But here, the government failed to provide protection when it had already decided protection was necessary.*

*Id.* (emphasis added). Judged by these standards, Cowart cannot bring the facts of this case within the *Cohen* holding.[21]

Cowart also contends that the government was negligent in providing inadequate psychiatric evaluation and treatment of McHarris in view of his prior history, particularly in light of the treatment team's concern for McHarris' safety and the safety of others. There was testimony going both ways. Both Dr. Fox and Dr. Stewart Ginsberg, a psychiatrist, testified that the government should have had a psychiatric evaluation of McHarris. Dr. Ginsberg testified that he "was amazed at the fact that

---

20. In fact, at the time the psychiatric evaluation was prepared, McHarris' record consisted of two arrests for larceny, one for theft, two for burglary, three for disorderly conduct, and one for "injury to person."

21. It may be that a prisoner-victim whose assailant was not psychotic or in maximum segregation can prevail under the standard of *Cohen*. However, we do not today address the outer limits of the *Cohen* doctrine; we merely hold that the instant case is not controlled by *Cohen*.

there was never any request for a psychiatric evaluation." Furthermore, he testified that the psychological treatment that McHarris received at FCI was wholly inadequate. Dr. Martin Bone, chief of the psychology department at FCI, testified, however, that the staff at FCI had been responsive to McHarris' psychological needs.

The treatment team had referred McHarris to the available psychologist trainee, who recommended a change in McHarris' program rather than another course. In her deposition, Ms. Gilbert admitted that she had only been at FCI five days "and therefore, had no forms [sic] on which to make" a conclusive judgment that McHarris posed a noticeably different threat than other inmates. This was an unfortunate circumstance, but we cannot say that it was sufficient to establish government negligence. Although she may not have had sufficient experience at FCI to determine the *relative* threat posed by McHarris, Ms. Gilbert was apparently qualified as a psychological intern to assess whether McHarris posed *any* danger to the prison community.[22] Cowart does not contend otherwise. In her professional judgment, Ms. Gilbert concluded that McHarris did not pose a threat to the other prisoners or to the institution. The fact that hindsight proves her wrong does not render the government negligent for referring McHarris to her or for failing to refer him to a psychiatrist. Given these facts and the testimony of Dr. Bone, we cannot say that prison officials breached a duty to Cowart by failing to have McHar-

ris evaluated by a psychiatrist. In so holding, we by no means countenance inadequate or substandard psychological evaluation or treatment of prison inmates, nor do we dilute the government's duty to "exercise . . . ordinary diligence to keep prisoners safe and free from harm." *Jones,* 534 F.2d at 54.[23] We hold only that on the basis of the testimony presented at this trial, the government's evaluation and treatment of McHarris were reasonable in light of his prior history.[24]

For the reasons stated above, the judgment of the district court is AFFIRMED.

**22.** *See* n. 11 *supra.*

**23.** We also note that holding the government to this standard, rather than some higher standard that would effectively make the government an insurer of inmate safety, permits the government to balance a prisoner's expectation of reasonable governmental efforts to secure his safety with the liberty interests of other inmates.

**24.** Cowart also submits that the government's supervision of C–Dormitory on the night of the assault was negligent. At trial one witness testified that one guard could not provide adequate supervision for the population of that dormitory. On the other hand, the government adduced evidence supporting its contention that one guard was adequate. James Ether-

idge, a unit manager at FCI, testified that the results of a study he had prepared concerning *inter alia,* manpower utilization and staffing problems indicated that many fewer incidents took place during the night shift than at any other time of day. Cowart adduced testimony from the former chief correctional supervisor at FCI that he had requested additional staffing for the shift while he was still in charge. On cross-examination, the government sought to establish that this request was relatively low priority. In light of the conflicting testimony we cannot say, as a matter of law, that the supervision provided by the government on the night of the assault was negligent.

We find Cowart's other contentions of negligence to be without merit.