Wali **MUHAMMED**, Plaintiff,

v.

**UNITED STATES of America**, Defendant.

No. 4:96–CV–711–A.

United States District Court, N.D. Texas, Fort Worth Division.

May 12, 1998.

---

Wali Muhammed, Fort Worth, TX, pro se.

William J. Andersen, U.S. Attorney's Office, Fort Worth, TX, for United States of America, defendants.

*MEMORANDUM OPINION and ORDER*

McBRYDE, District Judge.

## I.

*Nature and History of the Litigation*

This is an action brought by Wali Muhammed ("Muhammed") against United

States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680. United States of America has agreed that Muhammed exhausted his administrative remedies.

Muhammed has been an inmate in the custody of the United States Bureau of Prisons since he received a prison sentence of 70 months in 1992. His complaint seeks a monetary recovery to compensate him for damages he claims he suffered by reason of alleged improper medical treatment by prison medical personnel and because of having been confined at prison facilities that were not suitable for him due to his severe physical problems, including limitations on his ability to climb stairs and otherwise ambulate.

By order signed January 17, 1997, the court granted in part defendant's motion to dismiss or, in the alternative, for summary judgment, ruling that Muhammed take nothing on his medical malpractice claim on the ground that he failed to adduce in response to the motion for summary judgment any expert medical opinion to establish any negligent act or omission by a treating physician. The motion was denied as to Muhammed's remaining claims. The court concluded that Muhammed had established a duty of care owed to him by defendant pursuant to 18 U.S.C. § 4042, and that the summary judgment record raised genuine issues as to material facts with regard to his § 4042 claims.

On March 10, 1997, the court signed an order denying defendant's renewed motion to dismiss, which asserted that Muhammed's reliance on 18 U.S.C. § 4042 as a basis for his cause of action that the Bureau of Prisons failed to properly house and care for him was ill-placed. Section 4042 imposes on United States of America, through the Bureau of Prisons, the duties to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons . . . convicted of offenses against the United States" and to "provide for the protection . . . of all persons . . . convicted" of such offenses. 18 U.S.C. § 4042(a)(2) and (3). For the reasons given in the March 10 order, the court disagrees with the government's contention that § 4042 does not create a private cause of action. To

the case authorities cited in the order in support of the denial of the motion, the court adds *Jones v. United States,* 91 F.3d 623, 624–25 (3d Cir.1996).

The surviving claims of Muhammed were tried to the court on April 28, 1997. Muhammed appeared in person, *pro se,* and United States of America appeared by and through her Assistant United States Attorneys William J. Anderson and Charles Dobbs. Basically, the claims that were tried to the court were that the prison facilities at which Muhammed has been confined were not suitable for a person suffering from his physical afflictions, that because of the unsuitable conditions of the facilities he suffered accidents that caused him to sustain bodily injury damages, and that the unsuitability of the facilities caused him to suffer other damages in the nature of inconvenience, pain, and anguish.

The evidence adduced by Muhammed consisted of the testimony of Muhammed himself, the testimony of John Barry ("witness Barry"), who is a medical doctor employed at the Federal Medical Center in Fort Worth, the prison facility at which Muhammed is presently confined, and a number of exhibits. The defense evidence consisted of the testimony of Joseph Cox ("witness Cox"), who is an engineering technician employed by the Bureau of Prisons at the Federal Correctional Institution at Texarkana, Texas, the testimony of Wade Crews ("witness Crews"), who is employed by the Bureau of Prisons as an engineering technician at the Federal Correctional Institution at El Reno, Oklahoma, the testimony of David Hicks ("witness Hicks"), who is an employee of the Bureau of Prisons stationed in Washington, D.C., and who serves as the Chief Medical Designator for the Bureau of Prisons, additional testimony of witness Barry, and a notebook of exhibits that purports to contain copies of Muhammed's federal prison medical records, Muhammed's federal prison designation and assignment records, and the curriculum vitae of Dr. Barry.

II.

*Findings of Fact*

From the evidence received at trial, the court, based on the preponderance of the

evidence standard, makes the following findings of fact:

## A. *Chronology:*

1. In April 1992 Muhammed was assigned to the Federal Correctional Camp at El Paso, Texas, to commence service of a term of imprisonment of 70 months. A record of the Bureau of Prisons pertaining to that assignment notes that at that time Muhammed claimed to suffer with back and leg problems due to a gunshot wound he experienced in 1976.

2. In early 1993 the Bureau of Prisons transferred Muhammed from El Paso to the Federal Correctional Institution at Texarkana, Texas. The records pertaining to that transfer say that Muhammed suffers with back and leg problems due to a gunshot wound suffered in 1976. According to a record of the Bureau, the designation to FCI–Texarkana was for management of "medical/psychiatric." The records also contain an instruction in February 1993 to FCI–Texarkana to please review the medical upon arrival and to contact the medical designator if medical center is indicated. ·

3. By memorandum dated February 25, 1993, Al Haynes, Regional Designator of the Bureau of Prisons, South Central Region, Dallas, Texas, informed witness Hicks in reference to Muhammed that:

> AFTER REVIEWING THE ABOVE NAMED OFFENDER'S BP–337 INFORMATION SUBMITTED BY THE COMMUNITY CORRECTIONS MANAGER, IT HAS BEEN DETERMINED THAT HE/SHE MAY REQUIRE MEDICAL AND/OR PSYCHIATRIC TREATMENT IN A MEDICAL CENTER. PLEASE REVIEW THE INFORMATION AND MAKE AN APPROPRIATE DESIGNATION.

Defendant's Ex. B at 004. There is nothing in the exhibits disclosing that such a review or designation was made.

4. When Muhammed was assigned to FCI–Texarkana the Bureau of Prisons was aware of his potential medical problems, including his back pain, his paresis, and his neuropathies. Muhammed was given a medical examination at FCI–Texarkana on February 26, 1993, at which time he gave a history of having lower back trouble. His neurological examination was positive, disclosing relative weakness of his right leg and foot. He was assigned a lower bunk until March 15, 1993.

5. On March 15, 1993, the medical staff at FCI–Texarkana diagnosed Muhammed as having sciatica with damage due to a gunshot wound, and prescribed that he be given a low bunk in his living quarters and receive special shoes. A record of FCI–Texarkana shows that on July 2, 1993, Muhammed's major diagnosis was right paraparesis due to gunshot wound right hip.

6. On January 18, 1994, Muhammed informed medical personnel at FCI–Texarkana that he could not walk; he wanted a cane or a wheelchair if he could not have a cane. He was diagnosed as having mild neuropathy on the right. The records note that, in addition to having a lower bunk, Muhammed had an athletic restriction and a height-climbing restriction. The decision was made that he did not need a cane or wheelchair. On that date he was told by the medical staff that he should not walk or stand for prolonged periods and that he should not lift more than 25 pounds. On January 20, 1994, Muhammed again complained to personnel at FCI–Texarkana, this time that he was experiencing excruciating low back pain, and said that he needed stronger medication. His request was denied. He made similar complaints to medical personnel on April 1, 2, 27, and 28, and May 5, 1994. A request he made for a muscle relaxer was denied on April 1. However, on April 2 he was given a stronger pain medication. On May 6, 1994, Muhammed requested of medical personnel at FCI–Texarkana that he be given a knee brace and a cane, and he explained that he had an old gunshot wound that caused nerve injury. A brace and cane were ordered for him. A record of FCI–Texarkana shows that on June 28, 1994, the major diagnosis related to Muhammed's condition continued to be right paraparesis due to old gunshot wound right hip.

7. On June 29, 1994, Muhammed was taken to the United States District Court for the

Eastern District of Arkansas for sentencing on another federal offense. The sentence, which was imposed by the Honorable Garnett Thomas Eisele, United States District Judge, was that Muhammed serve a term of one year and one day, consecutive to the term of imprisonment he was then serving. The June 29 judgment of conviction and sentence contained the following recommendation to the Bureau of Prisons:

The court makes the following recommendations to the Bureau of Prisons: The defendant be incarcerated in a Medical Facility where he can receive treatment for severe chronic pain caused by bullet wounds and that he be given treatment and counseling for drug addiction. The Court further recommends that the designation be for the Medical Facility at Ft. Worth.

8. The Bureau of Prisons took no action in response to the recommendation made to the Bureau of Prisons by the June 29, 1994, judgment. Witness Hicks, who is the official within the Bureau of Prisons who had responsibility to determine whether such a recommendation would be honored, did not become aware of the recommendation until shortly before the trial of this action commenced in late April 1997.

9. On July 5, 1994, Muhammed complained of his physical problems to personnel at FCI–Texarkana, and requested that he be given muscular relaxants. That request was denied, but a request Muhammed made for new shoes was granted. In mid-July 1994, Muhammed was issued a pair of new shoes as he had requested.

10. On December 5, 1994, Muhammed complained to the medical staff at FCI–Texarkana of pain in his right knee. At the time he was walking with a cane, limping.

11. On December 18, 1994, Muhammed fell to the concrete floor on the way to the visiting room. He reported that he had no injuries as a result of the fall, and that the fall occurred when he tripped and stumbled. A medical examination conducted at FCI–Texarkana on December 18 disclosed contusions to Muhammed's left palm.

12. In January 1995 Muhammed again complained to prison personnel about the problem he was having with his lower extremities, this time complaining of nerve damage to his left leg. On March 7, 1995, Muhammed complained to medical personnel at FCI–Texarkana of increasing pain in his right knee, which was not relieved by the medication he was taking. He also complained that his legs were getting weaker. The physician who saw Muhammed on that occasion noted that Muhammed walked with some difficulty and that he had a rather marked muscle weakness. The physician made a record that Muhammed had a "neurological problem," and indicated that the gunshot wound Muhammed had experienced was not the cause of the problem. The physician recommended that Muhammed be seen by a neurology specialist. On March 14, 1995, Muhammed submitted an Inmate Request to Staff Member to the chief medical officer at FCI–Texarkana in which he explained:

REQUEST TO SEE PHYSICIAN: Dr. Stringfellow, I am in constant pain in my back, knees and legs. None of the medication that I have been given has done anything to reduce my pain. I was informed by Dr. Townsend that there are no facilities available here for the adequate treatment of my injuries. Since I was hurt here, then it would semm (sic) appropriate that my request to have a medical transfer to FCI Fort Worth would be approved. Additionally, the district court in my judgment and commitment order did suggest that I be transferred to FCI Texarkana (sic). Therefore, I would (sic) to meet with you about my pain and my transfer request.

Defendant's Ex. A at 304. A record of FCI–Texarkana shows that on March 30, 1995, Muhammed underwent a Magnetic Resonance examination of his lower spine, which revealed minimal degenerative changes at L4–L5, with anterior disc bulging and minimal anterior spurring of the 4th and 5th lumbar vertebrae.

13. In early May 1995, Muhammed fell down the stairs at FCI–Texarkana. He complained to medical personnel of pain in his

knee, back, hip, and shoulder. A few days later Muhammed was again seen by a member of the medical staff at FCI–Texarkana, this time complaining of pain in both calf muscles. The physician stated the impression that Muhammed was having lower leg muscle pain from an unknown cause. On May 21, 1995, Muhammed fell when his cane slipped on a grease spot. As a result of that fall, he had severe pain in his lower back and right leg, which increased when he was climbing stairs. A few days later Muhammed requested that he be provided with Canadian crutches, which were provided on May 25, 1995. At that time, his major diagnosis was stated on a record of FCI–Texarkana as being minimal degenerative changes L4–L5 and right paraparesis due to gunshot wound.

14. From no later than January 18, 1994, through his transfer in May 1995 from FCI–Texarkana, the facilities at FCI–Texarkana that Muhammed reasonably was expected to, and did, use were unsuitable for him considering his physical limitations and restrictions, and such facilities failed to meet his needs as a handicapped person. Starting no later than January 18, 1994, the Bureau of Prisons had knowledge of the physical limitations of Muhammed that caused the facilities at FCI–Texarkana to be unsuitable for him. Throughout Muhammed's stay at FCI–Texarkana starting no later than January 18, 1994, he was required to climb stairs and other heights and walk long distances in order to do those things that he reasonably would be expected to do as an inmate at that facility. Commencing in early 1994, the Bureau of Prisons, acting through its employees, failed to exercise that degree of care it reasonably should have exercised, and was negligent and failed to exercise ordinary diligence, in not causing Muhammed to be transferred from FCI–Texarkana to a facility that would accommodate Muhammed's physical limitations, considering the activities in which he reasonably would be expected to be engaged. Such failure and negligence constituted a failure on the part of the Bureau of Prisons to act reasonably to provide suitable quarters and provide for the safekeeping, care, and protection of Muhammed, who, at all times pertinent to this litigation, has been a person convicted of an offense against the United States. Such conduct on the part of United States of America, through the Bureau of Prisons, proximately caused Muhammed to suffer physical pain and mental anguish.

15. In May 1995 Muhammed was transferred from FCI–Texarkana to the Federal Correctional Institution at El Reno, Oklahoma. The only record the court can find in the exhibits that gives the reason for the transfer is a May 18, 1995, memorandum on an FCI–Texarkana memorandum form from Jack N. Hehmeyer, Jr., AHSA, to Scott Sutton, C–Unit, which says:

Muhammed was found guilty of threatening a staff member in a recent incident report. It was the decision of the Clinical Director that Muhammed could not serve in time in Disciplinary Segregation at the time. Disciplinary Transfer was also recommended by the DHO but it was not pursued at the time because the medical staff was attempting to obtain a medical transfer. The medical transfer has been denied by the Medical Designator at this point.

He has no special needs of an institution in seeking a Disciplinary Transfer other than the institution maintain 24 hour medical coverage, be proximate to local hospitals, and not require him to walk great distances in order to get around.

Defendant's Ex. 1 at 318. This document reflects that Muhammed's transfer from FCI–Texarkana to FCI–El Reno was not to accommodate his physical problems and related infirmities but, instead, had a disciplinary purpose. Such a transfer was made even though the medical staff at FCI–Texarkana believed that Muhammed should have a medical transfer. The court is unable to find in the exhibits documentation other than the contents of this one document that the medical staff was attempting to obtain a medical transfer or that such a transfer had been denied by the Medical Designator. However, the court finds, from the contents of this one document, that such a transfer had been sought and denied.

16. On May 25, 1995, before his transfer away from FCI–Texarkana, Muhammed was given a restriction that required use of crutches, and he was provided crutches.

17. After his arrival at FCI–El Reno, Muhammed was evaluated from a medical standpoint. The conclusion was reached that his disabilities prevented lifting and climbing stairs and required use of a lower bunk. A record of FCI–El Reno dated June 14, 1995, notes that Muhammed is a paraplegic. FCI–El Reno made arrangements for Muhammed to be seen by a neurosurgeon who was in private practice. Shortly thereafter he was seen by a neurosurgeon in Oklahoma City by the name of Dr. Brent Hisey. Dr. Hisey arranged for tests to be run. One of the tests, conducted in late July 1995, was done by Dr. Tonya Washburn, who interpreted the results of the tests she performed as being "most consistent with an upper motor neuron lesion, such as spinal cord compression or injury." Defendant's Ex. A at 125.

18. In early to mid-September 1995, the decision was made by the Bureau of Prisons to transfer Muhammed to the Medical Center for Federal Prisoners at Springfield, Missouri. The reasons given for the transfer are stated in a record of FCI–El Reno as follows:

NARRATIVE SUMMARY: THIS IS A 45 YEAR OLD BLACK INMATE DESCRIBES THAT SINCE JANUARY, 1994, HE HAS DEVELOPED PROGRESSIVE WEAKNESS IN THE RIGHT LOWER EXTREMITY THAT HAS NOW SPREAD TO THE LEFT LOWER EXTREMITY. HE CURRENTLY WALKS WITH THE ASSISTANCE OF CANES FOR THE PAST THREE MONTHS. WHEN EXAMINED BY THE NEUROLOGIST, IN JULY '95, IT WAS NOTED THAT HE REQUIRED A MODERATE DEGREE OF ASSISTANCE TO STAND AND AMBULATE. IT WAS ALSO NOTED THAT HE DRAGGED HIS LEFT LEG ... IT IS THE NEUROLOGISTS (SIC) BELIEF THAT THE INMATE HAS AN UPPER MOTOR NEURON LESION. THE CLINICAL DIRECTOR BELIEVES THE PATIENTS' (SIC) REQUIRED CARE AND NEED FOR EVALUATION HAS EXCEEDED OUR CAPABILITIES, AND REQUIRES TRANSFER TO A FEDERAL MEDICAL CENTER.

Defendant's Ex. B at 7. Another record gives as the reason for the designation "PROGRESSIVE PARESIS, LOWER EXTREMITIES, RIGHT GREATER THAN LEFT; POSS UPPER MOTOR NEURON LESION." Id. at 5.

19. Throughout the time Muhammed was confined at FCI–El Reno before his transfer to Springfield, the facilities at FCI–El Reno that Muhammed reasonably was expected to, and did, use were unsuitable for him considering his physical limitations and restrictions, and such facilities failed to meet his needs as a handicapped person. Throughout that time: (a) the Bureau of Prisons had knowledge of the physical limitations of Muhammed that caused the facilities at FCI–El Reno to be unsuitable for him; (b) Muhammed was required to climb stairs and other heights in order to do those things that he reasonably would be expected to do as an inmate at that facility; and (c) the Bureau of Prisons, acting through its employees, failed to exercise that degree of care it reasonably should have exercised, and was negligent and failed to exercise ordinary diligence, in causing Muhammed to be confined to FCI–El Reno considering Muhammed's physical limitations and the activities in which he reasonably would be expected to be engaged. Such failure and negligence constituted a failure on the part of the Bureau of Prisons to act reasonably to provide suitable quarters and provide for the safekeeping, care, and protection of Muhammed. Such conduct on the part of United States of America, through the Bureau of Prisons, proximately caused Muhammed to suffer physical pain and mental anguish.

20. Muhammed's transfer to Springfield occurred in late September 1995. He remained at Springfield until he was discharged and transferred back to FCI–El Reno in early February 1996. His condition was diagnosed by personnel at Springfield as follows:

Mr. Muhammed has idiopathic spinal cord degeneration. This is a progressive illness

by history and is quite rare. He will slowly become worse, but the process will not shorten his life span.

Defendant's Ex. A at 189. For all practical purposes, Muhammed was confined to a wheelchair when he returned to FCI–El Reno, though he was authorized to use crutches for short distances. He was diagnosed as being 50% disabled when he was discharged from Springfield. The recommendation of the warden of Springfield on February 3, 1996, as to a facility at which Muhammed should be confined upon discharge from Springfield was "FCI, EL RENO, OK., OR ANY APPROPRIATE FACILITY." Defendant's Ex. B at 12.

21. Shortly after he was sent back to FCI–El Reno, his medical status was noted to be "paraplegic," Defendant's Ex. A at page 278, and the staff there recognized the unsuitability of the facility for Muhammed and sought his transfer to an appropriate facility. In mid-March 1996 the staff at FCI–El Reno prepared a document that gave as the principle reason for requesting referral by Muhammed to another facility "INABILITY TO FUNCTION ADEQUATELY IN PRESENT LIVING ENVIRONMENT," Defendant's Ex. A at 294, and went on to explain that:

INMATE MUHAMMED IS EXPERIENCING GREAT DIFFICULTY IN AMBULATING ON OUR COMPOUND. WE REQUEST THAT HE BE TRANSFERRED TO A FACILITY WHICH IS BETTER SUITED FOR HIS DISABILITY.

*Id.* at 295. As indicted by a memo dated March 19, 1996, from "MEDICAL DESIGNATIONS AND TRANSPORTATION, CENTRAL OFFICE" to "CHIEF EXECUTIVE OFFICER, FCI EL RENO," the request that Muhammed be transferred to a prison facility that was more suited to his needs was denied. The text of the memo is as follows:

WE HAVE REVIEWED YOUR REFERRAL OF MARCH 18, 1996, WHICH REQUESTED TRANSFER TO A MEDICAL CENTER FOR THE ABOVE NAMED INMATE. REQUEST IS DENIED AT THIS TIME, DUE TO THE POPULATION PRESSURES AT THE MEDICAL CENTERS. ACCORDING TO THE DISCHARGE SUMMARY FROM MCFP SPRINGFIELD REGARDING THIS INMATE, HE NO LONGER REQUIRES PHYSICAL THERAPY AS HE HAS BEEN INSTRUCTED IN A "HOME" EXERCISE PROGRAM, TO INCLUDE WALKING WITH CANADIAN CRUTCHES. HE DOES CONTINUE TO REQUIRE A WHEELCHAIR, AND IS ABLE TO WORK. THEREFORE, WE SUGGEST YOU MAINTAIN THIS INMATE AT YOUR FACILITY. IF FURTHER GUIDANCE IS REQUIRED, WE SUGGEST YOUR MEDICAL STAFF CONTACT THE PHYSIOTHERAPY DEPARTMENT AT MCFP SPRINGFIELD.

*Id.* at 298.

22. The March 19, 1996, memo mentioned immediately above was followed by a March 22, 1996, memo from a unit manager at FCI–El Reno to Michael Maize, H.S.A., pertaining to Muhammed, saying:

DUE TO AN EXISTING MEDICAL CONDITION THE ABOVE INMATE NEEDS TO BE HOUSED IN ONE OF THE HANDICAP ACCESSIBLE ROOMS IN UNIT ONE OR UNIT TWO. THIS HOUSING CHANGE NEEDS TO BE COMPLETED ASAP. IF YOU HAVE ANY QUESTIONS PLEASE CONTACT ME.

*Id.* at 277.

23. On June 13, 1996, Muhammed informed medical personnel at FCI–El Reno that he was having severe pain in his left knee and that he could not put weight on that knee. Then, on June 21, 1996, a member of the medical staff at FCI–El Reno gave the following memo to "All Concerned":

It was brought to my attention that inmate Muhammed # 19148–009, is using a cane or crutches in some circumstances. Inmate Muhammed has been diagnosed with paraparesis, which means that both lower extremities are extremely weak and motionless. The use of cane or crutches would increase the possibility for risk of falls and further injury. Therefore, I do

**590**

not authorize the use of cane or crutches. Movement is restricted to wheelchair as the safest mode of travel for inmate Muhammed.

*Id.* at 299.

24. Throughout the time Muhammed was confined at FCI–El Reno after his transfer from Springfield, the facilities at FCI–El Reno that Muhammed reasonably was expected to, and did, use were unsuitable for him considering his physical limitations and restrictions, and such facilities failed to meet his needs as a handicapped person. Throughout that time: (a) the Bureau of Prisons had knowledge of the physical limitations of Muhammed that caused the facilities at FCI–El Reno to be unsuitable for him; (b) Muhammed was having difficulty ambulating at that facility; and (c) the Bureau of Prisons, acting through its employees, failed to exercise that degree of care it reasonably should have exercised, and was negligent and failed to exercise ordinary diligence, in causing Muhammed to be confined to FCI–El Reno considering Muhammed's physical limitations and the activities in which he reasonably would be expected to be engaged. Such failure and negligence constituted a failure on the part of the Bureau of Prisons to act reasonably to provide suitable quarters and provide for the safekeeping, care, and protection of Muhammed. Such conduct on the part of United States of America, through the Bureau of Prisons, proximately caused Muhammed to suffer physical pain and mental anguish.

25. In late July 1996 personnel at FCI–El Reno made another attempt to have Muhammed transferred to a facility more suited for his disabilities. The reasons given in one of the documents prepared for that purpose was as follows:

NARRATIVE SUMMARY: INMATE MUHAMMED IS A 46 YEAR OLD MAN WHO WAS EVALUATED AT FMC SPRINGFIELD IN SEPTEMBER 1995. HE WAS DIAGNOSED WITH IDIOPATHIC SPINAL CORD ATROPHY AT T1–T6. HE CONTINUES TO SUFFER WITH PROGRESSIVE PARAPARESIS AND IS ESSENTIALLY WHEEL CHAIR BOUND. HE IS CONSIDERED TO BE 50% DISABLED AT THIS TIME.

THE CLINICAL DIRECTOR BELIEVES INMATE MUHAMMED WOULD BENEFIT IMMENSELY FROM PHYSICAL THERAPY. WE DO NOT HAVE THE FACILITIES OR THERAPIST TO PROVIDE HIM WITH PHYSICAL THERAPY.

ALSO, INMATE MUHAMMED IS EXPERIENCING GREAT DIFFICULTY IN AMBULATING ON OUR COMPOUND. WE BELIEVE FT WORTH WOULD BE MORE SUITED FOR HIS DISABILITY AND WOULD GREATLY ENHANCE INMATE MUHAMMED'S QUALITY OF LIFE.

Defendant's Ex. B at 021. Witness Hicks denied the request, as reflected by a memo dated July 30, 1996, from his office to the Chief Executive Officer, FCI–El Reno. However, the denial left the "door open" by saying that it was "PENDING ADDITIONAL INFORMATION." *Id.* at 018. That same day, personnel at FCI–El Reno responded by memo to witness Hicks elaborating as follows:

INMATE MUHAMMED HAS BEEN DIAGNOSED WITH IDIOPATHIC SPINAL CORD ATROPHY T1–T6. HIS WORK UP IS COMPLETE AND REQUIRES NO FURTHER LABORATORY OR X–RAY PROCEDURES AT THIS TIME. PROCEDURES PERFORMED AT FMC SPRINGFIELD INCLUDED CHEST X–RAY AND THORACIC SPINE WHICH REVEALED A MILD DEXTROSCOLIOSIS. SUBSEQUENT MYELOGRAM AND CT SCAN SHOWED ATROPHY OF THE SPINAL CORD IN THE T1–T6 AREA.

INMATE MUHAMMED CURRENTLY IS TAKING PIROXICAM 20 MG DAILY, DARVOCET N 100 EVERY 6 HOURS AS NEEDED.

INMATE MUHAMMED'S ILLNESS IS PROGRESSIVE AND CONTINUES TO SLOWLY WORSEN. WHEN HE FIRST RETURNED FROM FMC SPRINGFIELD HE WAS AMBULATORY WITH CRUTCHES AND A WHEEL-

CHAIR. NOW HE IS ESSENTIALLY WHEELCHAIR BOUND.

THE CLINICAL DIRECTOR BELIEVES INMATE MUHAMMED WOULD BENEFIT IMMENSELY FROM PHYSICAL THERAPY BY RESTORING SOME FUNCTION TO HIS LOWER EXTREMITIES AND IS IN NEED OF A TERTIARY CARE FACILITY.

WE GAVE SPOKEN WITH THE FT WORTH FACILITY AND THEY ARE AMENABLE TO ACCEPTING INMATE MUHAMMED.

*Id.* at 016.

26. Apparently witness Hicks approved the transfer from FCI–El Reno after receiving the additional information. Muhammed was transferred to the Federal Medical Center at Fort Worth in early August 1996, where he remained through the date of trial. The records suggest that he has been wheelchair-bound since his transfer to FMC–Fort Worth. Although the records reflect that Muhammed has had complaints with his care and the facilities at FMC–Fort Worth, the records suggest that on the whole it has been a suitable facility for the housing and care of Muhammed.

B. *Discussion, and Further Fact Findings:*

In making the findings expressed in paragraphs 14, 19, and 24 above, the court has taken into account, and accorded appropriate deference to, the decisions made by personnel of the Bureau of Prisons relative to the prison facility to which Muhammed should be assigned at various points in time. And, the court has taken into account the testimony of witnesses Hicks and Barry on that subject, and has given to such testimony the degree of credibility it deserves. Most of the evidence underlying those findings is in the form of official records of the Bureau of Prisons that were received in evidence as exhibits. Muhammed's testimony corroborates inferences that are drawn from the records.

The records reflect that from the very outset of Muhammed's confinement in prison the possibility that he should be confined to a federal medical center existed and should be considered, and that the desirability of transferring him to such a center was repeatedly raised and advocated because of the unsuitability of the facility at which he was confined at the time. And, the records disclose the evidentiary facts that lead to the findings that the Bureau of Prisons, acting through its employees, failed to act properly in relation to the housing, safekeeping, care, and protection of Muhammed, at all times after early 1994 by confining Muhammed, first, at FCI–Texarkana, and, then, at FCI–El Reno.

Recapping: When Muhammed was first given a prison assignment in April 1992 the Bureau of Prisons was put on notice of his back and leg problems. At the time of his transfer to FCI–Texarkana in early 1993, the Bureau of Prisons was reminded of his infirmities, and a notation was made in his records that consideration should be given to placement of Muhammed in a federal medical center. Specifically, the Bureau of Prisons was told that it had been determined that Muhammed may require medical and/or psychiatric treatment in a medical center. The seriousness of Muhammed's physical problems, and his infirmities, became quite apparent in January 1994 when Muhammed informed the Bureau of Prisons that he could not walk, and that he wanted a cane, or a wheelchair if he could not have a cane. The Bureau of Prisons, through its medical staff, determined at that time that Muhammed should not walk or stand for prolonged periods. Yet, the Bureau of Prisons continued to confine him at a prison that required that he walk long distances and climb heights in order to do the things that he would be reasonably expected to do. A red flag was again sent up in late June 1994 when Judge Eisele made a written recommendation to the Bureau of Prisons that Muhammed be incarcerated in a federal medical facility, and further recommended that the facility be the medical facility in Fort Worth. While the Bureau of Prisons had no obligation to follow that recommendation, if it had been exercising the proper degree of care in reference to the provision of quarters and the safekeeping and care of Muhammed, it would have treated the recommendation seriously, or at least considered it, and taken it into account. In-

stead, it was not even brought to the attention of witness Hicks, the official who had responsibility to determine whether the recommendation would be honored. As time went by, the Bureau of Prisons gained further and further information concerning the seriousness of Muhammed's medical problems and the infirmities he had by reason of those problems. Rather than to transfer Muhammed to a medical facility when he was transferred away from FCI–Texarkana, the Bureau of Prisons transferred him to FCI–El Reno, which was another facility that was not suitable for Muhammed. When the transfer by Muhammed from FCI–Texarkana to FCI–El Reno occurred in the spring of 1995, the medical staff at FCI–Texarkana was attempting to obtain a medical transfer for Muhammed, but it had been denied by the Medical Designator, presumably having reference to witness Hicks. No attempt was made to explain this unusual · decision through the testimony of witness Hicks when he appeared as a witness at trial. When Muhammed started his confinement at FCI–El Reno, it ·was painfully apparent that his physical condition necessitated his placement in·a federal medical center. The evaluation of Muhammed at Springfield confirmed the seriousness of his physical problems and the limitations it imposed on him. Nevertheless, he was transferred back to FCI–El Reno rather than to a federal medical center, as the staff at FCI–El Reno had recommended before Muhammed's temporary stay at Springfield. Approximately one month after his return to FCI–El Reno, the staff there again pointed out the need for Muhammed to be in a medical facility, noting on the record in mid-March 1996 that Muhammed was unable to function adequately in the environment at FCI–El Reno and that he was experiencing great difficulty in ambulating at that facility; and, the staff again requested that he be transferred to a facility which is better suited for his disability. The Medical Designator, presumably witness Hicks, again denied the request. Witness Hicks did not direct his attention when he testified at trial to his reasons for denying this request, other than his conclusionary testimony that Muhammed was properly housed during his tenure in the federal prison system. Witness

Hicks provided no explanation why he did not honor, and put into effect, the recommendations of the on-site Bureau of Prisons personnel who, based on their expertise· and personal observations of Muhammed and personal knowledge of the facilities, were recommending that Muhammed be placed at a medical facility.

The extent to which witness Hicks and the central office were willing to disregard the knowledge and recommendations of local prison personnel is emphasized by the extraordinary efforts in which the personnel at FCI–El Reno were required to engage in the summer of 1996 before they finally caused witness Hicks to approve Muhammed's transfer to a federal medical center, as had repeatedly been recommended and requested from time to time during the two years before the transfer actually took place. The court cannot accept, and has not accepted, the conclusionary testimony of witnesses Hicks and Barry concerning the adequateness of the facilities. Rather, the court gives credence to the hard evidence in the form of the records of the Bureau of Prisons, which are corroborated by Muhammed's testimony, that the facilities simply were not adequate. While, as the Bureau of Prisons has pointed out in its post-trial filing, there are reasons why Muhammed's credibility might be questioned, Muhammed's testimony relative to the difficulties he experienced at FCI–Texarkana and FCI–El Reno are, for the most part, substantiated by the prison records. The court has no reason to question the credibility of Muhammed's testimony on those subjects. The testimony given by witnesses Cox and Crews does not significantly vary from the testimony of Muhammed relative to the problems he encountered at the facilities in FCI–Texarkana and FCI–El Reno. As previously noted, the court has accepted Muhammed's testimony on those subjects.

■ There is evidence that witness Hicks either failed to receive, or did not timely receive, information that would have been important to a determination of the adequacy of Muhammed's housing. The court has concluded, and finds, that all such information should be imputed to witness Hicks, because

no satisfactory explanation was given as to why information pertinent to the facilities designation was not promptly provided to the ultimate decision-maker.

Muhammed has expressed the belief that the falls he experienced while in custody were responsible for at least part of his disability. The court does not doubt that Muhammed honestly has that belief, but the medical records simply do not support such a contention. There is no reason to doubt the accuracy of the diagnosis made at Springfield, which is set forth in paragraph 20 above. That diagnosis is inconsistent with Muhammed's contention that his ongoing physical problems were caused, or aggravated, by the falls he experienced. Those falls have no role in this litigation beyond being taken into account in evaluating the degree of pain and anguish Muhammed suffered by reason of the Bureau of Prison's failures to provide him suitable quarters, care, and safekeeping.

### C. *Facts Pertinent to the Damage Issue:*

■ Muhammed's testimony, when combined with the medical records, convinces the court, and the court finds, that Muhammed experienced severe pain during the periods of time when he was not suitably housed. For example, Muhammed testified that at one point in time at FCI–Texarkana he was required to walk a total of about 800 feet to go to and from the dining facility. He said that he suffered a great deal of pain because of having to make that walk—his testimony was that every step of the way to and from the dining facility caused him a lot of pain. In addition to the pain he suffered by reason of walking, he experienced pain as he navigated stairs at the inappropriately assigned FCI–Texarkana facility. A fair inference from the record is that throughout the many months he was at FCI–Texarkana commencing in early 1994 and then during his two stays at FCI–El Reno, ending in the summer of 1996, Muhammed daily experienced pain or discomfort because of the failure of the Bureau of Prisons to cause him to be housed in a suitable facility. In addition, a fair inference from the record is that throughout that time Muhammed suffered considerable

inconvenience, probably on a daily basis, because of the unsuitability of the facilities at which he was confined, and that such inconvenience cause him mental anguish. In addition, the record supports the inference that, throughout, Muhammed experienced concern over the possibility that he was suffering, and would continue to suffer, long-term adverse effects by reason of the inadequate facilities to which he was assigned. The rejection of his request that he be properly housed, and the disregard of Judge Eisele's recommendation that he be sent to a federal medical center, undoubtedly provided a discouraging and bleak picture for Muhammed. Summed up, Muhammed spent a period of approximately two years having to negotiate with pain physical facilities that were not suitable for him, accompanied by uncertainty as to whether the Bureau of Prisons would ever cause him to be properly housed. The adverse effects on Muhammed, as mentioned above, were proximately caused by the inappropriate conduct of the Bureau of Prisons mentioned in paragraphs 14, 19, and 24 above. Muhammed would not have suffered those adverse consequences if the Bureau of Prisons had acted reasonably to provide him suitable quarters and for his safekeeping, care, and protection.

■ The court turns now to the dollar amount to be awarded to Muhammed as damages because of adverse effects proximately caused by the improper conduct of the Bureau of Prisons. The court finds that two elements of damage should be recognized in the total damage award, physical pain and mental anguish. The inconvenience and concerns mentioned in the immediately preceding paragraph of this memorandum opinion are put under the umbrella of mental anguish. While the court has not had, or found, an analogous case from which to gain guidance in fixing the damage award, the court has taken into account that very significant amounts have been recognized as proper awards for intangibles such as physical pain and mental anguish. *See, e.g., Wheat v. United States,* 860 F.2d 1256, 1259–60 (5th Cir.1988). Considering relevant factors, the court finds that an appropriate award of damages to Muhammed for the losses mentioned above would be $30,000.00 for physical

pain and another $15,000.00 for mental anguish, for a total award of $45,000.00.

## III.

### Conclusions

To whatever extent any of the statements made in the preceding parts of this memorandum opinion might be viewed to be conclusions, they are incorporated by reference in this section III. To whatever extent any of the things said in this section III might be considered to be findings of fact, they will be so treated for the purposes of this opinion.

■ As the Supreme Court noted in *United States v. Muniz*, "the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state law." 374 U.S. 150, 164–65, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). Muhammed had the right to bring this action under the Federal Tort Claims Act for breaches of that duty. *Id.* at 150, 83 S.Ct. 1850. *See also Jones,* 91 F.3d at 624–25; *Cowart v. United States,* 617 F.2d 112, 116 (5th Cir.), *cert. denied,* 449 U.S. 903, 101 S.Ct. 275, 66 L.Ed.2d 134 (1980); *Jones v. United States,* 534 F.2d 53, 54 (5th Cir.), *cert. denied,* 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 586 (1976). The duty of care owed by the Bureau of Prisons to inmates requires "the exercise of ordinary diligence to keep prisoners safe and free from harm." *Cowart,* 617 F.2d at 116; *Jones,* 534 F.2d at 54. In order for a plaintiff to recover for a failure of the Bureau of Prisons to comply with one of its § 4042 obligations, "the plaintiff must show that the Government was negligent in the exercise of its responsibilities." *Jones,* 534 F.2d at 54. The evaluation of the legal merit of Muhammed's claim includes an inquiry as to whether the Bureau of Prisons acted unreasonably in failing to assign Muhammed to an institution equipped to meet his needs as a handicapped person if the facilities to which he was assigned were not reasonably handicapped accessible. *See Wooten v. United States,* 825 F.2d 1039, 1043–44 (6th Cir.1987).

The government has placed reliance on a quote taken from a footnote in *Dawson v. United States,* 68 F.3d 886, 896 n. 19 (5th Cir.1995), that "[v]iolation of a federal statute or regulation does not give rise to FTCA liability unless the relationship between the offending federal employee or agency and the injured party is such that the former, if a private person or entity, would owe a duty under state law to the latter in a *non-federal* context." The statement in *Dawson* is *dicta*. Moreover, the case cited in *Dawson, Johnson v. Sawyer,* 47 F.3d 716 (5th Cir.1995), merely recognizes that courts have "generally refused to find the necessary state law duty in an assertedly violated federal statute or regulation merely because the law of the relevant state included a general doctrine of negligence per se." 47 F.3d at 728–29. This is simply not one of those general cases to which reference is made.

Here, the court is dealing with a statute that the Supreme Court in *Muniz* specifically held creates a duty of care owed by the Bureau of Prisons to a federal prisoner, a violation of which can form the basis for an action under the Federal Tort Claims Act. *Muniz,* 374 U.S. at 150, 164–65, 83 S.Ct. 1850. To whatever extent the court is required to look to state law to determine whether the conduct of the prison officials caused there to be an actionable violation of the statutory duty, the tort laws of Texas and Oklahoma would "flesh out" the elements of liability. An accurate statement of a basic principle of Texas tort liability is that "[i]t is the aim of the law to protect every person against the wrongful act of every other person, and the law has provided an action for injuries done by disturbing a person in the enjoinment of any right or privilege the person has." 70 Tex. Jur.3d, Tort Liability § 2 at 402. And, "the essential elements of a tort cause of action [under Texas law] consist of a legal right possessed by the plaintiff, a corresponding duty or obligation on the part of the defendant, and a breach of failure to perform the duty or discharge the obligation." *Id.* § 5 at 409–10. The court has no reason to think that the state law of Oklahoma would not be basically the same as Texas law; and, the court presumes that it is.

■ Moreover, the court is not using a mere violation of § 4042 as a basis for con-

cluding that the government has been guilty of actionable conduct. Rather, the court, as have other courts which have dealt with the issue, has required proof of the failure to exercise ordinary care, or unreasonable conduct, as a predicate to a finding of liability under § 4042. In other words, the proper approach is to view § 4042 as creating for tort liability purposes a duty to exercise ordinary care, or, as some courts have said, reasonable care, to do those things the Bureau of Prisons is obligated by § 4042 to do. For instance, the mere failure to provide suitable quarters to an inmate is not actionable, but a failure to exercise ordinary care, or reasonable care, to provide suitable quarters is actionable, assuming that the inmate has suffered a loss which was proximately caused by such a breach of duty. The facts found by the court cause United States of America to be liable to Muhammed in the amount of $45,000.00, for which judgment should be entered for Muhammed against United States of America.

After Muhammed rested his case at trial, the government moved for judgment under Federal Rules of Civil Procedure 52(c). The court delayed ruling on that motion. The court is now denying the government's motion for judgment. Therefore,

The court ORDERS that defendant's Rule 52(c) motion be, and is hereby, denied; and

The court further ORDERS that Muhammed have and recover from United States of America $45,000.00 to compensate him for his damages, as mentioned above.

### FINAL JUDGMENT

For the reasons given in the memorandum opinion and order signed by the court on the same date of the signing of this final judgment,

The court ORDERS, ADJUDGES and DECREES that plaintiff, Wali Muhammed, have and recover from defendant, United States of America, $45,000.00.