**Susan KANE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 99 CIV 0399(DC).**

United States District Court, S.D. New York.

Feb. 22, 2002.

Coblence & Warner, By: Kenneth E. Warner, Howard Schrader, New York, New York, for Plaintiff.

James B. Comey, United States Attorney for the Southern District of New York,

By: Silvia L. Serpe, David S. Jones, Assistant United States Attorneys, New York, New York, for Defendant.

## *OPINION*

CHIN, District Judge.

On February 5, 1997, plaintiff Susan Kane was crossing Third Avenue at 69th Street when she was struck by a United States Postal Service truck. She brought this action to recover for her injuries. The case was tried to the Court without a jury from February 4 through February 11, 2002. For the reasons set forth below, judgment will be entered in favor of Kane against the United States. Pursuant to Fed.R.Civ.P. 52(a), my findings of fact and conclusions of law follow.

## *FINDINGS OF FACT*

### A. *Plaintiff*

Kane was born in 1960 and is now 41 years old. At the time of the accident, she was 36 years old. She graduated from the University of Scranton in Pennsylvania in 1982 with a bachelor of science in computer science. She also has an associate's degree in business from Rockland Community College. She is presently single, having divorced in November 1988 after a three-year marriage. She has no children. (Tr. at 29–30; Stip. Facts ¶ 1).[1]

Prior to the accident, Kane had a highly successful and promising career in computer systems and training. Her first job after college was as a programmer for Peat Marwick Mitchell, making $21,000 per year. (Tr. at 31–32). Over the course of the next 13 years, she held jobs at four different companies (Data General, Feder-

al National Mortgage Association, Digital Equipment Corporation, and Union Bank of Switzerland) and her job responsibilities and compensation steadily increased. By the mid–1990's, she was earning some $70,000 per year, with management, marketing, and training responsibilities in computer systems. (Tr. at 33–34). With a combination of strong technological skills, knowledge of computer systems and software, and interpersonal skills, she prospered professionally. In particular, she had a "knack for taking the technology, the real technical information, and making it sound easy, doable, [by] putting it into end-user's, or layman's, terminology." (Tr. at 34).

In August 1996, Kane joined Credit Suisse as an Associate in Information Technology at a salary of $75,000 per year, with a $5,000 starting bonus as well as a minimum guaranteed bonus for 1996 of $5,000. (PX 39, at 101 1739). Within weeks, Credit Suisse merged with First Boston and the new entity became known as Credit Suisse First Boston ("CSFB"). Kane was shifted over to the First Boston side of the new company and placed in a position where she was to train the top executives and other employees to use computer technology. The job required her to market the computer technology to the executives, to interest them in using computers and computer software. The position gave her visibility, as she worked with the highest executives in the company. (Tr. at 34–41).

Kane was an assistant vice president at the time of the accident. As of January 1, 1997, her salary had increased to $78,000 per annum, not including bonuses. (PX 39, at 248 1580). The work was demand-

---

1. References to "Tr." are to the trial transcript; to "Stip. Facts" are to the stipulated facts contained in the joint pretrial order; and to "Dep." are to the transcript of the deposition in question. References to "PX" and "GX" are to plaintiff's exhibits and the Government's exhibits, respectively.

ing, requiring long hours, including work in the evenings and on weekends. At times, she would go out with friends after the workday but then return to the office to work further. (Tr. at 53). She had a strong work ethic and was performing at a high level; as one of her supervisors testified, she had the "potential to continue to perform at a high level." (Tr. at 334). Even after the accident, her salary continued to increase: rising to $85,800 effective July 1, 1997, and to $92,500 effective January 1, 1998. (PX 39, at 248 1580). If she had continued to work at the same "high level," more likely than not she would have been promoted to vice president in 1998 or 1999. In that event, she would have earned in the range of $140,000 to $160,000 or more (salary and bonus) for 1999 and 2000. (Tr. at 337, 340, 347–50).

In general, before the accident Kane was doing extremely well, physically, psychologically, personally, and socially. She was attractive, outgoing, and energetic. She led an active life. She took scuba diving and cooking classes. She went white water rafting, camping, and mountain climbing. She was a black diamond skier and played volleyball and golf. She went to the gym three times a week, using the treadmill, elliptical fitness machine, stairmaster, and weight machines. She went on many vacations with friends and enjoyed going to restaurants, parties, and clubs. She was an avid dancer. She was often the center of attention and, as her friend Mary Crotty described it, "no matter where we [were], in bars or restaurants or parties, she was always being asked out." She was involved in community activities, including working with at a neighborhood homeless shelter and fundraising for her church. (Tr. at 43–54, 276, 360–62; PX 36).

Over the years, Kane had her share of stresses in life. In 1983, her younger brother was killed in a motorcycle accident. (Tr. at 29). Her divorce resulted in a year and a half of therapy. (Tr. at 304–05). Her job at Digital Equipment was stressful. (Tr. at 844, 870). But she was never diagnosed with clinical depression, nor was she ever prescribed anti-depressants for depression, and by February 1997 these matters were long behind her. (Tr. at 302–05).

Kane also had some injuries or ailments prior to the accident, but nothing unusual or out of the ordinary. For example, she saw a chiropractor for "general health problems," including menstrual cramps, headaches, and stomach ailments, for approximately two years prior to the accident. (Forster Dep. at 16, 19–21; Tr. at 274). She injured her right knee skiing. (Tr. at 192, 277). At some point she had minor neck, jaw, and back injuries. (Tr. at 274–75, 496–97, 835). In general, however, she was in good health, psychologically and physically, before the accident. (*See, e.g.,* GX D–6 (12/28/93 "Normal CT scan of the neck.")). Her chiropractor described her as being "very upbeat." (Forster Dep. at 23).

### B. *The Accident*

On Wednesday, February 5, 1997, at approximately 6:30 a.m., Kane left her home at 72nd Street and First Avenue for work. She was planning to go to the gym first to work out before starting her workday at CSFB. Her intent was to walk to the subway station at 68th Street and Lexington Avenue to take the subway to her office. (Tr. at 55–56; Stip. Facts ¶¶ 3, 4, 5).

Although it was raining lightly, Kane did not have an umbrella. She was wearing a blue coat and white sneakers. It was still dark; sunrise did not occur until 7:02 a.m. The streetlights were still lit and the cars

had their headlights on. (Tr. at 56–57, 60, 491, 875, 896).

Kane reached 70th Street and Third Avenue at approximately 6:40 a.m. She was walking south on the east side of Third Avenue approaching 69th Street. At the same time, a two-and-a-half ton United States Postal truck driven by Carl Huff was stopped at a traffic light on 69th Street. The truck was the first vehicle at the light. (Tr. at 57, 59, 883, 885, 888–90, 896; Stip. Facts ¶¶ 6, 7).

At some point before she reached 69th Street, Kane looked across Third Avenue and saw that the traffic light had changed to "walk." She started to cross Third Avenue, stepping off the curb into the street approximately 18 feet north of the crosswalk. She looked down Third Avenue, saw no cars at the intersection of 69th Street and Third Avenue, and saw some cars stopped at the traffic light on Third Avenue further south at 68th Street. She was walking at a brisk pace on a diagonal, intending to enter the crosswalk approximately at the midpoint of Third Avenue, where she intended to head directly west to reach the northwest corner of the intersection. She did not see the postal truck. (Tr. at 60–68, 70–71, 492, 495, 832, 856–57).

In the meantime, Huff saw his traffic light change from red to green. He had his turn signal on and was intending to make a right turn onto Third Avenue. After the light changed, he checked the mirrors on both sides of the truck. He saw that the truck was clear and he proceeded into the intersection. He cleared the crosswalk on 69th Street (which was 12 feet wide), entered the intersection slowly, and turned right, entering the crosswalk on Third Avenue (which was also 12 feet wide). He started turning into the third lane on Third Avenue (counting from the east side of the avenue). Because of the size of the truck, he turned wide. The truck was moving slowly.[2] (Tr. at 890–92, 915–22). Third Avenue is seven lanes wide at 69th Street. (Tr. at 68, 859).

Before she reached the crosswalk as she was walking on a diagonal across Third Avenue, Kane heard the sound of a vehicle to her left. Her first thought was one of annoyance, that a car would come so close to her. When she turned, however, she saw a truck bearing down on her, about to hit her. She heard a voice in her head say "Run, Susan, run," and she tried to run but could not. The truck hit her on her left side—her left leg—and she was propelled forward and knocked to the ground, landing on her hands and her chin and face. (Tr. at 72–75).

When Huff had started making his turn, he did not see any pedestrians in the crosswalk. He never beeped his horn. Just as he was about to complete the turn, he heard the noise of an impact with the truck. He immediately stepped on the brakes and stopped the truck. He opened the door, saw Kane, and realized that he had hit her. (Tr. 893–96, 905–09, 923).

Huff never saw Kane before he hit her. He did not see her even though she crossed in front of the entire width of the truck, walking from right to left. Kane was struck by the front bumper on the left side of the truck right in front of where Huff was sitting in the driver's seat. Visibility apparently was poor because of the rain and darkness; Huff had both his windshield wipers and his headlights on.

---

**2.** Huff testified that he was only traveling at three to five miles per hour (Tr. at 895), but I do not accept that testimony. First, if the truck had been moving that slowly, Huff probably would have seen Kane. Second, two Postal Service accident reports note that Huff stated that the truck was moving at approximately five to eight miles per hour. (GX FF, GG).

But the truck had large windows that permitted a "good view of the road," and there were no other vehicles in the intersection or parked along the east side of Third Avenue (where there was a bus stop) to obstruct his view. Huff did not see any pedestrians, for if he had he would have deferred to the pedestrians, who he knew had the right of way. (Tr. at 896, 903, 922–24). On the driver's side, there were two mirrors that created a blind spot because Huff could not see behind the mirrors, that is, he could not see through the mirrors. (Tr. at 904).

Approximately five to seven seconds elapsed between the point Huff's traffic light turned green and the point that he heard the noise of the impact. (Tr. at 921). Kane would have been walking for approximately that length of time, and as a fast walker, she crossed to approximately the west side of the third lane of Third Avenue when she was hit. (Tr. at 72, 470; *see* Tr. at 891, 915). She had not yet reached the crosswalk but was a few feet north of the crosswalk when she was hit. (*See* Tr. at 73). The truck had not cleared the crosswalk. (*See* GX EE, FF).

As Kane was knocked to the ground, she felt pain in her head, chin, teeth, jaw area, and left leg. She could feel the teeth horizontal in her mouth and she was swallowing blood. She felt cuts inside her mouth. People came to her assistance. Someone held an umbrella over her to protect her from the light rain. At some point she stood up and sat on the step of the postal truck. An ambulance came. The medical technicians placed a restraint on her neck and a brace on her leg. She was taken to New York Hospital for emergency treatment. (Tr. at 83–86).

As a result of the accident, the Postal Service disciplined Huff by placing him on modified suspension for three days. He did not contest the suspension. (Tr. at 898).

## C. Plaintiff's Injuries

Kane was examined in the emergency room at New York Hospital. She received treatment and was released that evening. (GX R–1; Tr. at 86). As discussed more fully below, as a result of the accident, she suffered (1) injuries to her mouth, teeth, and jaw, (2) a disk herniation in her neck, (3) a tear of the medial collateral ligament ("MCL") in the left knee, with an avulsion fracture, and (4) psychological injury and trauma.

### 1. The Mouth, Teeth, and Jaw

When Kane was knocked to the ground by the truck, she landed on her face. The emergency room notes confirm "trauma to face" and abrasions to the chin and right cheek. (GX R–1). The fall knocked out Kane's upper two front teeth (tooth no. 8 and tooth no. 9); fractured one of the lateral incisors (tooth no. 7), breaking off a piece; and twisted or moved another lateral incisor out of place (tooth no. 10). The gums and lip area were bruised and lacerated. (Goldin Dep. at 41–43, 45–46). At New York Hospital, an oral surgeon removed the two front teeth and stitched up portions of Kane's mouth. (Tr. at 87; *see* PX 37A (photograph of plaintiff with front teeth missing)).

Two days after the accident, Kane saw her dentist, but her mouth was too swollen for any work to be done on it. (Tr. at 173–74). Kane was eventually referred to Dr. James E. Jacobs, a periodontist specializing in cosmetic gum surgery and bone grafting (Jacobs Dep. at 19), and Dr. Joel Goldin, a prosthodontist specializing in restoring missing and deformed teeth. (Goldin Dep. at 9).

For two and a half weeks after the accident, Kane had no front teeth at all;

instead, she had a gap in her teeth. Dr. Goldin then provided her with two temporary false teeth attached to a "flipper" that was in turn attached to the roof of her mouth. (Tr. at 175). Kane described the contraption as follows:

> They looked like big fake teeth. They didn't look very—they didn't look good. It was hard to eat with it because there was this big piece of plastic on the roof of my mouth.

(Tr. at 175; *see* Jacobs Dep. at 30–31; Goldin Dep. at 91–92). The "flipper" remained in Kane's mouth for several months. Sometimes she would remove the false teeth to eat; at one point a co-worker said he would no longer eat with her because "he was just so grossed out that he was eating with a woman with no teeth." (Tr. at 178).

Over a period of months Dr. Jacobs rebuilt the gum area, drilled two holes in the gums, and installed "posts." Kane then had to wait some six months to make sure the posts would "take"—to make sure they would not be rejected by the gums. (Tr. at 177; Jacobs Dep. at 30–32, 64–66). During this period Kane was fitted with a second set of false teeth that could accommodate the posts that were now sticking out of Kane's gums. The second set looked better than the first. (Tr. 177–80). At some point tooth no. 7 was repaired and covered with a cap. Finally, the implants were installed, as the two new teeth (crowns) were installed onto the posts. (Jacobs Dep. at 82; Goldin Dep. at 50–51, 56–57).

The process, which took more than ten months, was a success. Kane now has an artificial gum line, two artificial teeth (implants and crowns), and one cap (on tooth no. 7). Her teeth look fine, and she no longer has any difficulty chewing or eating. When she bites, however, she "can't feel anything" with the two implants, and this causes a sensation different from what she was used to and that she does not like. At one point one of the implants was chipped and a new one had to be installed. The implants may need to be replaced in the future, although probably not for many years. (Tr. at 178–82; Jacobs Dep. at 28–29; Goldin Dep. at 87).

## 2. *The Neck*

When Kane was knocked to the ground, she fell forward on her face and her head and cervical spine were forced backwards. That force placed pressure on the C5/6 disc, resulting in a disc herniation—a tear in the anulus and the posterior longitudinal ligament. (Tr. 214–35).

Kane did not immediately complain of any pain in her neck, and the emergency room examination revealed no neck or back pain or tenderness. (*See* Tr. at 518). This was not surprising, in view of the pain Kane was feeling from her other injuries, including the injuries to her teeth and mouth. (Tr. at 240). About two and a half weeks after the accident, however, Kane began experiencing pain in her neck and down her arms. She felt a "tingling" down her arms as well as stiffness in her neck and at the top of her back. She had never had this combination of pains before. (Tr. at 194). In March 1997, she had an MRI done on her cervical spine, which showed that she had suffered a central disc herniation at C5/C6. (Tr. at 214–23; Arginteanu Dep. at 19, 21; *see* PX 20, at 4, 8).[3]

---

**3.** The Government's orthopedic expert, Dr. Merola, testified d that the accident did not cause Kane to suffer a herniated disc or other injury to the neck because in his view Kane's neck problems were the result of a longstanding degenerative condition. (Tr. at 520, 539–40). I did not find Dr. Merola's testimony convincing and therefore I reject it to the extent it conflicts with the testimony of Dr. Lavyne. I found Dr. Lavyne to be far more

Over the course of the next three and a half years, Kane intermittently felt pain in her neck, radiating down her arms. Often these were intense spikes of pain, triggered, for example, when she reached to get something out of a filing cabinet. (Tr. at 277–81).

Finally, around Thanksgiving of 2000, the pain became worse. She was experiencing neck pain, right arm pain, tingling, and numbness, with some difficulty writing with her right hand. (Arginteanu Dep. at 9–10; Stacy Dep. at 11–13). The pain was "terrible and incapacitating." (Arginteanu Dep. at 14). In December 2000, another MRI was taken of Kane's neck. It showed that the herniation had progressed and was now associated with disc and osteophyte compression of the spinal cord at the C5/6 level. (Tr. at 222; PX 20, at 4). She started wearing a collar around her neck, continuously. (Tr. at 476).

Kane saw Dr. Lavyne on January 3, 2001. He took an oral history, reviewed the medical records and both the 1997 and 2000 MRI's, and conducted a physical examination. He concluded that Kane's complaints were referable to the C5/6 disc herniation and osteophyte compression of the spinal cord. Because all conservative measures, such as medication and physical therapy, had failed, Dr. Lavyne recommended surgery, removal of the C5/6 disc, and fusion of the spine. (Tr. at 223–24; PX 20).

On March 5, 2001, Dr. Lavyne operated on Kane, removing the disc (and calcified osteophytes) at C5/6 and replacing it with a piece of bone. Dr. Lavyne found a herniated disc that had ripped the anulus fibrosis and the posterior longitudinal ligaments compressing the dura of the spinal cord. The ligament was torn because a piece of tissue had passed through it. The tear was caused by trauma—the whiplash neck injury that Kane suffered when she was hit by the truck. (Tr. at 230–35; PX 20, at 5–6). After the surgery Kane wore a collar around her neck for some eight weeks; between January and the surgery she had worn a collar intermittently. (Tr. at 475–78).

The surgery was a success to the extent that the pain was lessened and Kane's strength improved, but she continued to have pain in her neck and arm. She was prescribed medication and physical therapy as well as a neck brace. Kane's prognosis for her neck is fair; she will have persistent problems with pain and perhaps other problems with her cervical spine from time to time as well. Stress and physical activity will increase her pain. Kane should also refrain from certain activities that would put pressure on the neck, such as jogging and jumping up and down in an exercise class. (Tr. at 241–43). She also has a permanent scar on her neck. (Tr. at 231).

persuasive. He has more experience than Dr. Merola and was the treating neurosurgeon who performed the surgery and actually removed and examined the disc in question. He reviewed the March 1997 MRI in January 2001 and concluded then, as his notes dictated that day show, that the films showed a herniated disc. He reached this conclusion not because he was hired to provide expert testimony but solely in the course of providing treatment. The reasons he articulated for his views are more convincing and logical than the reasons offered by Dr. Merola for his views. Moreover, Dr. Merola was mistaken about a critical fact (he wrote in his initial report that Kane did not complain of neck pain until two months after the accident when it was only two to three weeks) and he offered his initial opinion without even looking at the MRI film. Rather, he reviewed only the MRI report, and in describing it, he omitted the finding of a possible herniation, noting only a "Mild Disc Bulge." (GX OOO). Dr. Merola clearly was straining to give an opinion as favorable to the Government as he could. (See, e.g., Tr. at 589–90, 594–96, 613–15, 621).

Kane has been fully disabled since late November 2000. (Tr. at 243–44, 846–48). She is likely to be able to return to work soon, although she will have a residual disability. (Tr. at 244).

### 3. *The Knee*

As a result of the accident, Kane tore or sprained her M.C.L. § in the left knee and sustained an avulsion fracture, where a small piece of the bone was pulled off the femur as the ligament separated from the bone. At New York Hospital, Kane's leg was placed in a brace. (Tr. at 88; PX 37C). She continued to wear a brace for approximately a year, and she was still wearing the brace when she saw Dr. Wickiewicz on January 20, 1998. (PX 15). In the interim, she had seen other doctors for her knee. (*See, e.g.*, PX 4; PX 11). She used crutches for three to five months after the accident. (Tr. at 849).

Dr. Wickiewicz encouraged Kane to wean herself off the brace, to become more active, to start using the leg, and to engage in physical therapy. (PX 15). When he saw her, almost a year after the accident, the knee had healed but it had healed loose. The ligament had healed in a "lightly lengthened position" and did not heal as a "normal ligament." The avulsion fracture had also healed as the bone "resorbed." Surgery was not recommended, but Dr. Wickiewicz wanted her to get out of the brace and to start exercises to strengthen the leg. (Wickiewicz Dep. at 31–33, 43, 83). Kane apparently had re-

mained in the brace for too long. (Merola Dep. at 531–32).

Kane started physical therapy, and her knee eventually became stronger. But she continued to have pain and problems persisted. The looseness in her knee will be there "forever," as her knee has reached maximum medical improvement. (Wickiewicz Dep. at 50; *see* PX 15; Tr. at 536). She completed her formal physical therapy but continues to exercise on her own. She will be able to engage in recreational sports and activities and perform sedentary work (Wickiewicz Dep. at 81–82), but she may have some pain and instability of the knee as a result from time to time. (Tr. at 534, 536–38).

### 4. *Psychological Injury and Trauma*

As a result of the accident, Kane suffered from post-traumatic stress disorder.[4] She was exposed to a traumatic event that involved actual serious injury and threatened death. She felt intense fear, helplessness, and horror as she saw the truck about to hit her. She had recurrent and intrusive distressing recollections of the event, disassociative flashbacks, and recurrent distressing dreams about the event. She avoided crossing the street for some period of time; she had a markedly diminished interest and participation in significant activities (such as social activities with friends); she had a feeling of detachment or estrangement from others (as she felt disconnected and alone); and she developed a sense of a foreshortened future (as she was fearful she would never have a

---

4. The Government's psychiatry expert, Dr. Myles Schneider, testified that Kane did not suffer from post traumatic stress disorder (Tr. at 713), but Dr. Schneider's testimony was completely unconvincing as he was clearly striving to support the Government's position in any way possible. For example, he refused to concede that Kane must have felt intense fear or horror as she was standing in the middle of Third Avenue and saw a truck about to hit her. (Tr. at 810–13). In addition, Dr. Schneider's contention that Kane is a malingerer (Tr. at 765) is absurd. No other doctor reached this conclusion; even Dr. Merola concluded otherwise. (Tr. at 582). Kane returned to work just six weeks after the accident and she worked hard in physical therapy and at work.

normal life again). She had irritability and outbursts of anger; she had difficulty concentrating; she was hypervigilant; she had difficulty sleeping; and she had an exaggerated startle response. These symptoms lasted for substantially more than a month and caused clinically significant distress or impairment in her ability to function, to have relationships, and to live a normal life. (Tr. 101–06). On March 28, 1997, Dr. Ward Cunningham–Rundles prescribed Zoloft, an antidepressant, for Kane. (PX 5, at D0000111). Kane starting seeing a therapist, Cathy Levy, a certified social worker, in approximately early April 1997. (Tr. at 99).

Approximately a year and a half after the accident, Kane's post-traumatic stress disorder started to subside as she started to improve physically. (Tr. at 106–07, 117). She continued, however, to suffer from depression as a result of the accident. The pain and injuries caused her to have feelings of worthlessness and hopelessness as she felt isolated and alone. She had trouble concentrating and completing tasks. (Tr. at 107–09). The combination of injuries and the hundreds of appointments for doctors, dentists, orthodontists, orthopedists, neurosurgeons, psychotherapists, x-rays, MRI's, CT scans, and physical therapy took their toll on Kane, as she testified:

> It was a long ordeal. I had a lot of different injuries that I was dealing with. I just know that I was dealing with a lot and I had a lot of pain, I had a lot of fatigue, I had the intermittent neck pain and, you know, people kept saying, You look good. What's wrong with you?
>
> So it was hard, ... since I didn't, you know, have this deformity, people expected me to be able to do what I used

to be able to do and I couldn't. I didn't know why.

(Tr. at 287–88).

In December 1998, Kane started seeing Dr. Jesse Rosenthal, a specialist in psychiatry and psychopharmacology. She complained of fatigue, depression, and anxiety. Her symptoms included increased rapid eye movement sleep (an indication of nightmares or excessive dreaming), fatigue (particularly in the morning), being tearful, sensitivity to rejection, difficulty relaxing, decreased memory and concentration, distractability, loss of pleasure, feeling flat, very monotone and gray, isolated from friends, and low confidence and self-esteem. (Tr. at 421). Dr. Rosenthal changed Kane's medication, continuing the Zoloft but adding Wellbutrin, another antidepressant. Dr. Rosenthal has continued to see Kane since December 1998 and he has occasionally changed the dosages. Over three years or so there has been gradual improvement, but she continues to suffer from dysthymia, a mild form of clinical depression. (Tr. at 113, 430–38). More likely than not, the depression is a permanent condition. (Tr. at 116, 121, 440).

At trial, Kane described the differences in her life before and after the accident as follows:

> Personally, I really used to be extroverted. I used to spend a lot of time with—I used to be very outgoing and just enjoying friends, family, doing things, you know. I have seven nephews. I liked doing things like that, like playing with them. Now, I don't like being around people, and I feel bad about that. I feel bad just making excuses, No, I'm too tired, I'm, you know, I just am not going to make it to the party, I'm not going to be there. Or not wanting to call people back, I think, oh, tomorrow, I'll call them when I feel bet-

ter and it's just not as though I feel better. And I just feel bad about that, and yet tomorrow doesn't seem to come.

You know, when I got hit by the truck, I was 36 years old. I, you know, I don't know if I ever would have gotten married or had children. I don't know. But I feel that I would have liked it to be more of my choice. I just feel that I haven't been able to put my best foot forward. I still don't feel like I'm back to putting my best foot forward, and I resent that. And I hate the fact that I feel resentful. I hate the fact that I'm— it's like I'm a pessimist now, like I look for, like I see the negative things in life and I just, I can't stand that about myself.

(Tr. at 489–90).

At trial, in cross-examining Kane's therapist, the Government tried to minimize Kane's damages by suggesting that she did date after the accident and that she participated in "cyber dating." (Tr. at 131–32). The fact that Kane resorted to "cyber dating," however, only demonstrates how Kane's life had changed as a result of the accident. When asked whether she had been able to sustain a relationship with one man, someone named Russ, Kane replied:

Obviously not. I don't—I don't like the person that I've become. And especially in the past five years, right now I have much more energy than I've had in the past five years. After my surgery, it gave me back a lot of me. I'm not anywhere near back to [the] me that I used to be. But in the last five years, I've been so exhausted and so, like a battery that gets drained so fast, so I'd have sparks of energy, but then it would dwindle, and I felt like I just didn't have

the energy to, kind of like keep me going. I would just run out of energy.

So when I was out with Russ, I just felt like I couldn't, I couldn't, I didn't, I didn't, I didn't have the energy to be in a relationship. Like I didn't want to be with me. Why would anybody else want to be with me....

(Tr. at 310–11).

## D. *The Economic Losses*

Kane returned to work on April 18, 1997, just six weeks after the accident, working half days. In June, her hours began to increase until September 1997, when Kane was working essentially full-time, with time off for medical appointments. She continued on that basis until April 9, 1998, when she took a leave of absence, which continued until September 14, 1998, when she returned part-time. That continued until Thanksgiving of 2000, when, as discussed above, her neck injury caused her to stop working all together. (Tr. at 282–84).

When she returned to work in April 1997, she put in what one of her supervisors described as "a heck of an effort"; her performance and effort were so strong and she had such good potential for the future that CSFB paid her as if she had worked full-time. (Tr. at 327). In 1997, her salary was $81,900 and she was given a bonus of $30,000, even though she only worked part-time and missed six weeks of work because of the accident. (Tr. at 327–29; PX 39, at 384). She was given a salary increase for 1998 to $92,558 and she received a bonus for 1998 as well, even though she took a leave of absence of some five months. (Tr. at 330, 473; PX 39, at 374, 384). Kane was paid her full salary until January 1999, when CSFB started paying her on an hourly basis.[5]

---

**5.** From November 2000 until May 2001 she received short-term disability of $140 per week. For the period from May 2001 to date she has received long-term disability of

Kane's tax returns show her adjusted gross income as follows (reflecting bonuses in the year they were paid):

| 1997 | $ 78,774 |
| 1998 | $111,918 |
| 1999 | $ 67,850 |
| 2000 | $ 71,536 |

(GX AAA–3 to AAA–6). Kane was totally disabled throughout 2001 and thus did not work. She lost some $6,000 in 401(k) contributions as well for the period after she joined a 401(k) plan. (*See* PX 105).

If Kane had not been hit by the truck, however, more likely than not she would have received a higher salary and bonus for 1998 and she would have been promoted to vice president by the beginning of 1999 and would have been earning approximately $160,000 per year (including bonus) in that position. She would have received increases each year thereafter of an average of 6%. (*See* Tr. at 658–60).

Kane is likely to be able to return to work soon, more likely than not within the next three months. When she does, she will not be able to perform at the same level she was performing at before the accident. At this point, she does not have the energy or strength to work in the same type of demanding, stressful positions that she previously held. (Tr. at 389–97).

I am confident, however, that Kane will be able to recover professionally at some point in the future. She is a strong, hardworking, bright, articulate individual. She wants to go back to work and she wants to feel productive. (Tr. at 312). I have no doubt that she will someday once again be able to handle a job of responsibility comparable to what she was doing before. I

$3,120 (including a lump-sum payment for the period from May through November

find that, more likely than not, it will take her ten years to reach that point. In the meantime, she will make substantially less than what she would have made had she not been hit by the truck. (Tr. at 663–72).

Kane has also sustained out-of-pocket expenses as a result of the accident. Some of these were covered by insurance but many were not. Indeed, she sustained at least $144,439.06 in expenses as a result of the accident, for which she was reimbursed by insurance for only $72,207.55. She paid $63,249.94, and there remains a balance of $8,981.57 in medical bills that apparently have not been paid at all. (PX 86, 87). She will have additional out-of-pocket expenses in the future.

### DISCUSSION and CONCLUSIONS OF LAW

#### A. Jurisdiction and Venue

This Court has subject matter jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) (the "FTCA"). Venue in this District is proper pursuant to 28 U.S.C. § 1402(b) both because Kane resides in this District and because the act complained of occurred within this District.

#### B. Applicable Law

##### 1. Liability and Comparative Fault

■ Pursuant to the FTCA, New York law governs with respect to the claim of negligence, the sole claim before the Court. 28 U.S.C. § 1346(b). To prevail on a claim of negligence under New York law, a plaintiff must prove that: (1) defendant owed plaintiff a duty of care; (2) defendant breached that duty; and (3) the breach proximately caused plaintiff's inju-

2001). (Tr. at 846–48).

ries. *Ducrepin v. United States*, 964 F.Supp. 659, 663 (E.D.N.Y.1997); *Gardner v. United States*, 896 F.Supp. 89, 92 (N.D.N.Y.1995).

■ A driver of a vehicle has a duty to "exercise due care to avoid colliding with any ... pedestrian ... upon any roadway and shall give warning by sounding the horn when necessary." N.Y. Veh. & Traf. Law § 1146 (McKinney 1996). "Due care is that care which is exercised by reasonably prudent drivers." *Russell v. Adduci*, 140 A.D.2d 844, 528 N.Y.S.2d 232, 234 (3d Dep't 1988).

■ A plaintiff must exercise the reasonable care that a reasonably prudent person would use under similar circumstances to protect herself from injury. *Kulaga v. State of New York*, 37 A.D.2d 58, 322 N.Y.S.2d 542, 545 (4th Dep't 1971), *aff'd*, 31 N.Y.2d 756, 338 N.Y.S.2d 436, 290 N.E.2d 437 (1972). A pedestrian who crosses a road other than within a crosswalk "shall yield the right of way to all vehicles upon the roadway." N.Y. Veh. & Traf. Law § 1152(a) (McKinney 1996). A pedestrian who crosses outside the crosswalk has a duty to exercise greater care for her own safety while crossing the street. *Franco v. Zingarelli*, 72 A.D.2d 211, 424 N.Y.S.2d 185, 190 (1st Dep't 1980). Where a plaintiff is contributorily negligent, her "damages otherwise recoverable shall be diminished" in proportion to her share of fault. N.Y.C.P.L.R. § 1411 (McKinney 1997).

The plaintiff bears the burden of proving fault on the part of the defendant by a preponderance of the evidence. The defendant has the burden of proving contributory negligence on the part of the plaintiff by a preponderance of the evidence. 1B New York Pattern Jury Instructions 2:275.1 (2000) ("NYPJI").[6]

### 2. *Damages*

A plaintiff who has been injured by another's negligence is entitled to a sum of money that will "justly and fairly" compensate her for all losses proximately caused by the wrongdoing, to restore her, to the extent possible, to the position she would have been in had the wrong not occurred. NYPJI 2:277; *see McDougald v. Garber*, 73 N.Y.2d 246, 538 N.Y.S.2d 937, 939, 536 N.E.2d 372 (1989). Juries may award a prevailing plaintiff damages for noneconomic losses—injury and conscious pain and suffering, including the loss of enjoyment of life—as well as for economic losses—out-of-pocket medical and other expenses, lost earnings and other monetary employment benefits, and impairment of earning ability. A jury may award damages both for actual past losses as well as for reasonably certain future losses, taking into account plaintiff's age, health conditions, life expectancy, work-life expectancy, and other such factors. *See* NYPJI 2:280, 2:280.1, 2:285, 2:290, 2:301.

Because economic losses can be proven with some precision they can be redressed with relative exactitude by an award of the amount of the loss. Noneconomic losses, however, are different, as the New York State Court of Appeals has observed:

> [R]ecovery for noneconomic losses such as pain and suffering and loss of enjoy-

---

**6.** The Government argued in its pretrial papers that Kane had failed to prove a "serious injury" as defined in the New York no-fault law, a prerequisite to suit in a motor vehicle accident case. (Gov't Prop. Findings of Fact & Concl. of Law, ¶¶ 21–25). The argument is frivolous, for Kane clearly suffered several serious injuries, even putting aside the contested neck injury: it is undisputed that as a result of being struck by a two and a half ton truck, she tore or sprained her MCL; sustained an avulsion fracture; lost two teeth and chipped another; and suffered clinical depression.

ment of life rests on 'the legal fiction that money damages can compensate for a victim's injury.' We accept this fiction, knowing that although money will neither ease the pain nor restore the victim's abilities, this device is as close as the law can come in its effort to right the wrong. We have no hope of evaluating what has been lost, but a monetary award may provide a measure of solace for the condition created.

*McDougald*, 538 N.Y.S.2d at 939–40, 536 N.E.2d 372 (citation omitted).

## C. *Application*

### 1. *Liability*

■ The Government is liable to Kane, for Huff was negligent. Huff owed Kane a duty to use reasonable care to avoid hitting her. He breached that duty. Although he testified that he looked before he turned onto Third Avenue, it is difficult to believe that he did look, for he never saw Kane until after he hit her—he did not see her until after he stopped the truck and opened the door. He never saw her before he hit her even though she walked across the entire front of the truck. He never saw her even though there were no other cars to obstruct his view. Even assuming he did look, clearly he did not look carefully. Huff did not exercise the care that a reasonably prudent driver would have exercised. His negligence proximately caused Kane's injuries.

The Government has suggested that Huff might have had difficulty seeing Kane

because the visibility was poor as it was still dark and it was raining. This argument is rejected, for if Huff could not see because the visibility was poor, he should not have proceeded into the intersection without taking extra precaution to insure that the intersection was clear. More likely than not, Huff did not look, or if he did look he did not look carefully, or he could not see Kane because of the blind spot. In any of these scenarios, he was at fault. Even in the latter scenario, he should have seen Kane before she reached the blind spot because she crossed in front of the truck from right to left, and he should have adjusted for the blind spot by moving his head to get a different angle.

■ I conclude that Kane was also negligent. She did not cross in the crosswalk, and she did not look as carefully as she should have. She never saw the truck. A reasonably prudent person, particularly one crossing outside the crosswalk, would have looked more carefully and seen that a truck was making the turn. Kane's negligence was a proximate cause of her injuries.

Clearly, however, Huff was far more at fault. I conclude that Huff was 90% at fault and that Kane was 10% at fault. Hence, Kane's recovery will be reduced by 10% to account for her comparative negligence.[7]

### 2. *Damages*

■ In most personal injury cases, a jury decides the amount of money that is

7. The Government took the position, in its pretrial papers and even in its opening statement at trial, that Huff was not negligent at all and that Kane was 100% at fault. (Gov't Prop. Findings of Fact & Concl. of Law, ¶¶ 10, 11; Tr. at 13). It is difficult to understand how the Government could take such a position, in view of the facts even as shown in the depositions. The Postal Service and Huff themselves recognized that he was at least

partially at fault, as the Postal Service disciplined him by suspending him, with his consent, for three days. By the conclusion of trial, the Government argued in its summation first that the Government's percentage of liability was "de minimis," but then, when pressed, that it was 40% at fault and then, when pressed further, that perhaps it was 50% at fault. (Tr. at 931, 934).

the appropriate "measure of solace" for noneconomic losses, and there is good reason to call upon six (or eight) jurors from all walks of life to exercise their collective knowledge and wisdom to reach a just verdict. In this case, however, by virtue of the FTCA and the Government's limited waiver of sovereign immunity, the task is left to the Court alone. In setting damages, I have taken into account Kane's significant and permanent physical injuries, her emotional and psychological trauma, her substantial loss of her ability to enjoy life, the adverse impact her injuries have had and will continue to have on her socially, personally, and professionally, and the economic losses she has sustained to date and will continue to suffer in the future.

Kane's life has been shattered because a Postal Service employee driving a two and a half ton truck failed to look carefully as he made a turn. She has responded to the adversity with as much dignity and grace as possible under the circumstances. Far from being a malingerer, she has worked hard to be "productive" again. She returned to work just six weeks after the accident, which was probably too soon. Clearly, she made extraordinary efforts to re-capture the life she had, but with limited success. She will never, for example, be a black diamond skier again. Instead of being the center of attention at parties, she now is encouraged by her therapist to go on cyber dates. She has gone from

being a vibrant, vivacious person to, in the Government's words, being "coherent" and "functioning." (Tr. at 957, 958). She has lingering doubts about her future ability to be a wife and mother and to have a family, and she has lost the ability to make a choice about many important aspects of her life.

I will award Kane damages for (a) economic losses, consisting of (i) past lost earnings, (ii) past out-of-pocket expenses (including the outstanding medical bills that have not yet been paid), (iii) future lost earnings, and (iv) future out-of-pocket expenses,[8] and (b) noneconomic losses, consisting of (i) past injuries, conscious pain and suffering, and loss of the enjoyment of life, and (ii) future injuries, conscious pain and suffering, and loss of enjoyment of life, as follows:

a) **Economic Losses**

Past Lost Earnings

$406,000.

Past Out-of Pocket Expenses

$ 80,000.

Future Lost Earnings

$600,000.

Future Out-of Pocket Expenses

$150,000.

b) **Noneconomic Losses**

---

**8.** Pursuant to the collateral source rule, deductions will be made from the same category of loss for which reimbursement is or will be provided from collateral sources such as insurance and disability benefits, where such reimbursement is proven with "reasonable certainty." N.Y. C.P.L.R. § 4545(c) (McKinney 1992); *see Oden v. Chemung Co. Indus. Dev. Agency,* 87 N.Y.2d 81, 637 N.Y.S.2d 670, 661 N.E.2d 142 (1995). Kane does not seek reimbursement for her out-of-pocket expenses for which she has been reimbursed. In terms

of disability payments, however, it appears that the disability insurer is entitled under the disability insurance plan to recover benefits paid to Kane from any amounts she may recover from any settlements or judgments. (PX 47, 48, 49). Counsel represents that the disability insurer is aware of this lawsuit and has been asked to be informed of any settlement or judgment. (Pl. Counsel's Letter to Court, dated 2/13/02). Hence, I will not make a deduction for the disability payments.

Past

$700,000.

Future

$500,000.

The total is $2,436,000. I have factored in interest and discounted to present value as appropriate. A deduction of 10%, or $243,600, will be made to account for Kane's comparative fault.

## CONCLUSION

The Clerk of the Court shall enter judgment in favor of plaintiff Susan Kane against the United States in the amount of $2,192,400, with costs (including the cost of depositions used at trial and the cost of the daily trial transcript).

SO ORDERED.