**J.F. SMITH, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 00 Civ. 2521(DC).**

United States District Court, S.D. New York.

June 17, 2002.

J.F. Smith, Marianna, Florida, Plaintiff pro se.

James B. Comey, United States Attorney for the Southern District of New York, By: Sean H. Lane, Sean C. Cenawood, Assistant United States Attorneys, New York City, For Defendants.

## MEMORANDUM DECISION

CHIN, District Judge.

*Pro se* plaintiff J.F. Smith claims that in the winter of 1998–1999 he was locked in a segregation cell so cold that at times he could see his own breath, his knees swelled and his arthritis worsened, and he suffered severe stress, anxiety, and panic attacks. In this action under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C.

§§ 1346, 2671–2680, he charges that the Bureau of Prisons (the "BOP") breached its duty to provide him with "suitable quarters" as required by law. *See* 18 U.S.C. § 4042(a)(2).

This case was bifurcated and the issue of liability was tried to the Court on May 28 and 29, 2002. Judgment will be entered in favor of the defendant United States. Pursuant to Fed.R.Civ.P. 52, my findings of fact and conclusions of law follow.

## FINDINGS OF FACT

### A. *Plaintiff*

Plaintiff is a federal inmate enrolled in the Witness Protection Program. J.F. Smith is a pseudonym. Smith pleaded guilty to conspiracy and murder in aid of racketeering in 1997. In July 2001, he was sentenced to ninety months in prison. Despite his plea, Smith has appealed, contending that he should have received a further downward departure based on his medical condition. (Tr. at 16–17).[1]

Smith suffers from osteoarthritis in both knees. He developed the condition when he was 27, or more than 10 years before the period relevant to this claim. (Tr. at 35–36). The staff at FCI Otisville was aware of his medical condition, and he was receiving treatment. (Tr. at 18, 54).

In August 1998, Smith was transferred to protective custody in the Witness Security ("WitSec") Unit at FCI Otisville. He was assigned a job as a cook shortly after he arrived. On November 15, 1998, he was involved in a fight in the kitchen. He was transferred to administrative segregation, also known as the Classification Unit. (Tr. at 15, 19). Smith was angry about the transfer. (Tr. at 48). He thought it was unfair that the other inmate—who Smith

---

1. References to "Tr." are to the trial transcript; references to "PX" and "GX" are to plaintiff's exhibits and the Government's exhibits, respectively.

claims was the aggressor—was allowed to remain in the general WitSec population while Smith was placed in isolation. (Tr. at 19, 48, 135).[2]

Smith was transferred to FCI Allenwood, in Pennsylvania, on February 7, 1999. (Tr. at 18).

## B. Segregation Within the WitSec Unit

The WitSec Unit at FCI Otisville is a separate, self-contained housing area for inmates who are cooperating or have cooperated with the Government. (Tr. at 64). The building is V-shaped, with four tiers or cell ranges—two levels on each wing. WitSec inmates with discipline problems, or who otherwise need to be isolated, are confined to the Classification Unit, which contains three cells, numbered 200, 201, and 202. (Tr. at 66, 146). These cells are at one end of the facility, on the first floor. (Tr. at 99–100).

FCI Otisville houses roughly 1100 inmates. (Tr. 98). Two heating units serve the WitSec building. Unit HV10 heats the common areas and offices, and unit HV9 the two cell wings. Unit HV9 delivers heat to all the WitSec cells, including those in the Classification Unit. (Tr. at 96, 100, 190).

## C. The Plaintiff in Segregation: How Cold Was It?

### 1. Smith's Complaints

As soon as Smith was moved to isolation on November 15, he complained to staff that his medical condition would be affected by the cold in his cell, and that he would be unable to get into his assigned upper bunk in cell 201. (Tr. at 21). The staff acted quickly, as Smith was transferred back to his former cell in the general WitSec population within three hours.

The temperature was acceptable there at the time, although Smith had complained about that cell's temperature in the past. (Tr. at 23–24).

On November 18, 1998, plaintiff was returned to the classification unit and assigned to a lower bunk in cell 200. (Tr. at 24). Smith complained that the window in this cell was cracked and would not close properly. (Tr. at 25–26). None of the glass panes were cracked or missing, and although the latch handle was broken, the window could still be closed. (Tr. at 74, 196, 222–23; GX A–2, A–3, A–5).

After about two weeks, in response to his complaints, plaintiff was moved again, this time back to the unit's middle cell, 201. Smith remained there until late January, when he was transferred back to cell 200 for about a week prior to his transfer to FCI Allenwood. (Tr. at 28–30). Although the window in this cell may also have had a broken latch handle, the window still closed properly, and none of the panes were missing or cracked. (Tr. at 74, 196, 222–23).

Smith regularly complained about a perceived lack of heat. (Tr. at 165). He testified he did so "every day to every correction officer, every lieutenant, the duty officer, any unit team that would go back there, make rounds whenever they did, I complained to them." (Tr. at 28).

### 2. Objective Temperature Readings

In response to plaintiff's complaints, the staff from FCI Otisville's Facilities Department took temperature readings inside of cells within the classification unit on at least three separate occasions. Karl Lieb, the Facilities Department Supervisor of Heating, Ventilation and Air Conditioning,

2. Plaintiff's journal entries from the period suggest that it was his indignation about the incident that fueled this lawsuit, rather than concern about inadequate heat. (PX V).

and S.L., an inmate living within the Wit-Sec Unit who was assigned to assist the FCI Otisville Facilities Department, measured the temperature with a digital thermometer. On each occasion when temperature readings were taken, Lieb and S.L. measured the ambient air temperature in the middle of the cell and at the cell's heating vent. These readings showed that the ambient air temperature in the middle of the cell was between 60 and 65 degrees Fahrenheit and the air coming out of the heating vent within the cell was approximately 90 degrees Fahrenheit. (Tr. 89, 90–91, 191–94).

### 3. *Subjective Temperature Observations*

FCI Otisville houses inmates from all over the United States, and not surprisingly their preferences as to room temperature varied. At the same time that some inmates complained that it was too hot, others complained that it was too cold. (Tr. at 198). Accommodation by individual temperature adjustment was not possible. (Tr. at 108, 198).

During the period relevant to Smith's claim, the temperature in the WitSec Unit was maintained within a range that was reasonable, as a number of individuals with personal knowledge confirmed. Inmate S.L. lived in the WitSec Unit, in a cell heated by the same heating unit as plaintiff's. (Tr. at 190). S.L. never experienced insufficient heat at Otisville. (Tr. at 198). With Lieb, S.L. was responsible for maintaining the heating unit, and both confirmed that the unit functioned normally throughout the period. (Tr. at 88, 200).

A number of FCI Otisville employees with personal knowledge of Smith's complaints and of the temperature in his cell testified, and I so find, that it was never uncomfortable, either in his cell or just outside of it. These witnesses visited the classification cells on a regular basis during the relevant period. Corrections Officer Schlegel, for example, was responsible for conducting checks of the classification cells approximately every thirty minutes during his shift. He also entered plaintiff's cell regularly to transport him to exercise or shake down the cell's contents. (Tr. at 147–50; GX F). The Unit Manager, Mary Watts, visited the unit at least once a week, as did Warden Menifee, who visited every Thursday during weekly rounds. (Tr. at 58, 159).

### D. *Staff Responses to Smith's Complaints*

The staff at FCI Otisville was responsive to plaintiff's complaints. Indeed, when plaintiff first complained about the conditions of his cell in segregation, he was immediately moved back to the general population. Later, once returned to segregation, he was placed in a different cell, and when he complained that he was cold Schlegel provided additional blankets and long underwear immediately. When plaintiff renewed his complaints about the temperature, he was moved again, to a different segregation cell in the middle of the unit. (Tr. at 23–25, 28, 144–45, 151).

To address leaks around cell windows, staff responded progressively by providing additional caulking, cardboard, duct tape, and plastic. (GX A–1). Although there was likely a draft from plaintiff's window—photographs of the cell show that the bunks abut a metal window frame set in a wall of cinder block, and Otisville is located in upstate New York—heat from the unit was sufficient to overcome it. (GX D1–D4; Tr. at 108, 194–95, 210). Later, staff introduced a heater outside of plaintiff's cell. (Tr. at 56–57).

The facilities staff adjusted the damper, reducing fresh, cold air flow from 20 percent to 10 percent, and raised the thermo-

stat on the heating unit accordingly. (GX A–4; Tr. at 95). Both the facilities engineer, Karl Lieb, and S.L., the inmate helper, also responded by taking temperature readings on several occasions.

### E. *Plaintiff's Evidence*

Plaintiff presented evidence, consisting principally of his own testimony and the testimony of another inmate, John Powers, who was housed in the WitSec segregation unit at the same time, to support his claim that the temperatures were unreasonably low. The evidence was unconvincing. At trial, Smith refused to make a specific estimate of the temperature in segregation, saying only that he believed that both cells were below "minimal standards," or 55 degrees. (Tr. at 21–23). Smith claimed that the cell window latches were broken and thus the windows were held shut—or not quite held shut—by a thick-gauge wire or string. In addition, Smith alleged that the insulation around the window was faulty, and that he could feel cold air coming from around it. (Tr. at 26–27).

As a result, Smith testified that at times, it was so cold "it was blowing smoke out of our mouth." (Tr. at 31). On two weekends, Smith claimed the heating system was not operational. Although Smith contends, inconsistently, that there was never really any heat coming out of the system, except on one occasion, it was allegedly worse on these two weekends "because the heating system went down on a Thursday or Friday, and they told us we had to wait until the next Monday or Tuesday" for it to be repaired. (Tr. at 30–31).

Powers, a federal inmate no longer in the Witness Protection Program, who is also known as J.P. or J.J.P., testified via a video link from USP Florence in Colorado. At Otisville, Powers was kept in administrative segregation from June 1998 to January 1999. (Tr. at 239). Powers, who lived in cell 202, claimed that no heat was provided to the classification unit at all. He testified that he contracted pneumonia twice due to the cold, and that the average temperature inside his cell was roughly 30 degrees, fluctuating from the mid–30's to 40 degrees. (Tr. at 241). He claimed that the wind simply blew through the unit, through cracked and missing windows. (Tr. at 244). Powers even claimed that water from his leaky sink would freeze on the wall of the cell, and he called the situation "tortuous." (Tr. at 245). When Smith asked Powers if he could remember the especially cold weekends when there were supposedly mechanical problems with the heating system, Powers replied that he simply did not recall the "heat ever working back there." (*Id.*).

I reject Powers's testimony as well as plaintiff's testimony that the temperature was unreasonably cold. Indeed, I find that the temperature in the WitSec segregation cells did not fall below 60 degrees and was at all relevant times within a reasonable range and that, throughout the relevant period, the heating system at the WitSec Unit functioned normally.

### *PRIOR PROCEEDINGS*

This action was commenced on April 4, 2000. By memorandum decision dated September 5, 2001, plaintiff's sexual harassment and failure to protect claims were dismissed pursuant to Fed.R.Civ.P. 12(b)(1) and (6). *Smith v. Menifee*, No. 00 Civ. 2521(DC), 2001 WL 1035136 (S.D.N.Y. Sept.7, 2001). By memorandum decision dated March 26, 2002, I granted partial summary judgment dismissing plaintiff's *Bivens* claims based upon alleged violations of the Eighth Amendment. *Smith v. Menifee*, No. 00 Civ. 2521(DC), 2002 WL 461514 (S.D.N.Y. Mar.26, 2002). Only the plaintiff's FTCA claims based on inadequate heat remained. The United States

was substituted as the sole defendant. 28 U.S.C. §§ 1346(b)(1), 2679(a).

The issues of liability and damages were bifurcated, and I conducted a trial on liability on May 28 and 29, 2002. The case was tried without a jury pursuant to 28 U.S.C. § 2402.

## DISCUSSION and CONCLUSIONS OF LAW

### A. Applicable Law

■ The FTCA provides that the United States is liable for injury caused by the negligence of its employees under circumstances where a private person would be liable according to "the law of the place where the act or omission occurred," and thus New York law applies. 28 U.S.C. § 1346(b); *Kane v. United States*, 189 F.Supp.2d 40, 51–52 (S.D.N.Y.2002); *Ducrepin v. United States*, 964 F.Supp. 659, 663 (E.D.N.Y.1997). Under New York law, to prove his claim of negligence, plaintiff must establish three elements: (i) defendant owed plaintiff a duty of care; (ii) defendant breached that duty; and (iii) the breach proximately caused plaintiff's injury. *Kane*, 189 F.Supp.2d at 51–52.

Although state law sets out the elements required to prove negligence, the standard of care for the BOP is "fixed by 18 U.S.C. § 4042, independent of [any] inconsistent state rule" allowing for a local jailor's immunity from suit, or a lesser duty. *United States v. Muniz*, 374 U.S. 150, 164, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).[3] Section 4042(a) (2) requires that the BOP provide "suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2). This statutory duty means that the BOP must exercise "ordinary diligence" or reasonable care "to keep prisoners safe and free from harm." *Cowart v. United States*, 617 F.2d 112, 116 (5th Cir.1980); *see Herrington v. United States*, No. 83 Civ. 8007, 1984 WL 1279, at *2 (S.D.N.Y. Nov.28, 1984); *Castor v. United States*, 883 F.Supp. 344, 350 (S.D.Ind.1995).

It is clear that "the mere failure to provide suitable quarters" is not actionable: there must be fault. *Muhammed v. United States*, 6 F.Supp.2d 582, 595 (N.D.Tex.1998). Only "a failure to exercise ordinary care, or reasonable care, to provide suitable quarters" is actionable. *Id.; Graham v. United States*, No. CIV. A. 97–1590, 2002 WL 188573, at *4 (E.D.Pa. Feb.5, 2002) (noting that mandatory duty of care set forth in Section 4042 "does not dictate the manner in which the duty must be fulfilled"). In an unreported case, for instance, the Seventh Circuit affirmed the dismissal of an inmate's claim that he was burned by a malfunctioning shower at FCI Oxford, in Wisconsin. *Smith v. United States*, 19 F.3d 22, 1994 WL 55559 at *1–2 (7th Cir. Feb.24, 1994). The institution showed it acted with due care by providing "uncontroverted evidence" that the plumbing was regularly maintained, that the water temperature regulators were widely used and reliable, and that malfunctions were not a chronic problem. *Id.*

---

**3.** The rule in New York is not inconsistent in any event. New York law holds that the state "owes a duty to use reasonable care to protect its inmates from foreseeable risks of harm." *Melendez v. State*, 283 A.D.2d 729, 725 N.Y.S.2d 113, 114 (3d Dep't 2001) (internal quotations and citations omitted); *Kagan v. State*, 221 A.D.2d 7, 646 N.Y.S.2d 336, 342 (2d Dep't 1996) ("The case law leaves no doubt as to the existence of such a duty to provide for the health and care of prisoners."); *Cauley v. State*, 224 A.D.2d 381, 638 N.Y.S.2d 106, 107 (2d Dep't 1996) ("[A] duty of ordinary care is owed by prison authorities to provide for the health and care of their charges.") (internal quotations and citations omitted).

The parties have not cited any reported cases dealing precisely with inmate claims of injury due to inadequate heat in the FTCA context.[4] There are a number of such cases that arise under the Eighth Amendment, which prohibits cruel and unusual punishment and thus requires a higher showing of deprivation. These cases are instructive, however, and they reiterate that " 'routine discomfort' is considered inherent in the fact of incarceration." *Hylton v. Federal Bureau of Prisons,* No. CV 00–5747(RR), 2002 WL 720605 at *3 (E.D.N.Y. Mar. 11, 2002) (quoting *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)); *see Steele v. Schomig,* No. 96 C 99, 1996 WL 599640, at * 3 (N.D.Ill. Oct.11, 1996) (finding mere fact that plaintiff wanted his cell heated to a higher temperature did not necessarily mean that heat supplied was inadequate); *Dugan v. Washington,* No. 99 C 4382, 2001 WL 741626, at *5 (N.D.Ill. June 11, 2001) (noting prisoners need only be provided with "adequate heat") (citing *Del Raine v. Williford,* 32 F.3d 1024, 1035 (7th Cir.1994)); *Waring v. Meachum,* 175 F.Supp.2d 230, 243–44 (D.Conn.2001) (finding heat above 60 degrees was adequate); *see also Strickler v. Waters,* 989 F.2d 1375, 1382 (4th Cir.1993) (even accepting prisoner's complaint that cell temperatures were at times less then ideal, no Eighth Amendment violation where steps taken by prison officials including the issuance of blankets); *Weathersby v. Dalsheim,* No. 89 Civ. 1203(LLS), 1991 WL 102507, at *4 (S.D.N.Y. June 5, 1991) (no Eighth Amendment violation where plaintiff given additional blankets and prison personnel checked heating system to make sure working properly); *Benjamin v. Fraser,* 161 F.Supp.2d 151, 165–71 (S.D.N.Y.2001) (finding extremely low air temperatures below constitutional standards based on extensive monitoring of New York City jails).

## B. *Application*

The Government is not liable to Smith, because Smith has failed to prove negligence on the part of any federal employees. First, Smith has failed to prove by a preponderance of the evidence that his quarters were "unsuitable" at any time. Second, even assuming that Smith's cell was unsuitably cold, the Government demonstrated that it acted with due care, promptly responding to plaintiff's complaints and adequately maintaining the facility.

█ The BOP met its obligation under 18 U.S.C. § 4042(a)(2) to provide adequate housing to Smith. The heating system for the WitSec Unit as a whole was operational throughout the period, as shown by the witnesses who lived or worked there, and who testified that the temperature was within a normal range. Further, facilities staff obtained several temperature readings, all of which were within a normal range.

Even assuming that the housing provided to plaintiff was somehow inadequate at times, the evidence shows that defendant met its obligation under 18 U.S.C. § 4042(a)(2) to exercise "ordinary care." The BOP exercised ordinary care by taking a number of steps to address plaintiff's complaints.

Here, defendants responded to plaintiff's complaints about the cold by insulating his window with plastic and cardboard to reduce any drafts; raising the thermostat and checking and adjusting the heating

---

**4.** Section 1346(b)(2), added by the Prison Litigation Reform Act of 1995, requires a show-ing of physical injury for these claims.

system; taking temperature readings of the classification cells; supplying extra blankets; providing a portable heater in the hallway outside of his cell; and transferring plaintiff to other cells within the WitSec Unit, first to the general population and later to another cell within the classification unit. To the extent that these efforts failed—and the evidence shows that they did not—FCI Otisville employees were not negligent.

It may be the case that plaintiff was cold, but FCI Otisville contains inmates from all parts of the country. Institutions in the BOP system house more than 160,-000 inmates. The exercise of "ordinary care" to provide "suitable quarters" does not require the BOP to make all these inmates comfortable, nor to provide them with individual thermostatic control. The BOP is merely required to act with due care to keep its facilities temperate, that is, within a reasonable range. The BOP did so here.

## CONCLUSION

For the reasons set forth above and in the Court's prior two decisions, the Clerk of the Court shall enter judgment against plaintiff dismissing all the claims in the complaint, with prejudice and without costs. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision would not be taken in good faith.

SO ORDERED.